852 A.2d 299

**GREENE COUNTY and Greene County Children and Youth Services, Appellants,**

v.

**DISTRICT 2, UNITED MINE WORKERS OF AMERICA and Local Union 9999, United Mine Workers of America, Appellees.**

Supreme Court of Pennsylvania.

Argued Sept. 11, 2002.

Decided June 23, 2004.

348

Ronald J. Zera, Esq., for Greene County and Greene County CYS.

Michael James Healey, Esq., Pittsburgh, District 2 United Mine Workers of America.

Before: ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN, SAYLOR and EAKIN, JJ.

## OPINION

Chief Justice CAPPY.

In this appeal we are asked to consider a challenge to a grievance arbitration award rendered pursuant to a collective bargaining agreement and the Pennsylvania Employe Relations Act ("PERA").[1] Specifically, we are asked by Appellants Greene County and Greene County Children and Youth Services (collectively, "CYS") to determine whether the Commonwealth Court erred in upholding the arbitrator's award as

1. 43 P.S. § 1101.101 et seq.

being rationally derived from the collective bargaining agreement under the applicable standard of review known as the essence test. Based upon the aspects of the essence test set forth in our decision in *City of Easton v. American Federation of State, County and Municipal Employees, AFL–CIO, Local 447*, 562 Pa. 438, 756 A.2d 1107 (2000), we conclude that the arbitrator's award fails to pass that test and thus, we reverse the order of the Commonwealth Court and reinstate the order of the Court of Common Pleas of Greene County which vacated the arbitrator's award.

While the material facts underlying this matter, as found by the arbitrator, are somewhat lengthy, they are essential for proper resolution of this appeal. CYS provides child welfare services to Greene County residents. It provides these services through a staff of an Administrator, three Supervisors, and twelve Caseworkers. Christopher McKenzie was hired by CYS into the position of part-time Caseworker I on July 12, 1993 and approximately six months later he became a full-time employee. The Caseworker I job description requires, *inter alia*, that the caseworker keep dictation on all assigned cases current and perform all necessary paperwork. Indeed, the arbitrator noted that case file dictation was a critical aspect of the caseworker's duties and it was an unwritten policy that dictation should be kept current within approximately six weeks. Arbitration Award p. 2.

Approximately one year after assuming full time status, it came to light that McKenzie suffered from certain performance shortcomings. Specifically, on February 23, 1995, McKenzie's supervisor issued to McKenzie a memorandum identifying five files that were lacking dictation. These files dated back to March 1994. The memorandum noted that these files were previously brought to McKenzie's attention and that it was "imperative" that his dictation be brought into compliance. Arbitration Award p. 2. McKenzie's July 1995 performance evaluation resulted in an overall rating of "low good." Again in July 1996, McKenzie's supervisor issued a second memorandum notifying McKenzie of twelve files lacking dictation. McKenzie again received an overall rating of

"low good" in his August 1996 evaluation which highlighted the lack of dictation and failure to maintain files appropriately. Arbitration Award p. 3.

On August 1, 1996, McKenzie's supervisor and the administrator issued McKenzie a joint written reprimand regarding improper use of sick time. One month later, McKenzie received a second written reprimand concerning the failure to file CY–48 reports within thirty days of receiving a complaint of child abuse, as required by agency and state rules. This shortcoming in filing resulted in such reports being automatically expunged and placed children at risk of harm. The reprimand warned that "Any future violation(s) will result in disciplinary action which may include suspension." Arbitration Award p. 4.

On November 21, 1996, McKenzie's supervisor issued to him a memorandum apprising him that seventeen files were lacking information. This was after McKenzie had received a previous memorandum alerting him that there would be a file review. This memorandum required that "you must complete all dictation by 12/13/96. Failure to comply will result in suspension." Arbitration Award p. 4. Thereafter, McKenzie was issued a notice of suspension for failing to finish his work assignments by the deadline set for compliance. McKenzie was specifically notified that his failure to complete his work or failure to complete such work in a timely fashion resulted in the agency being out of compliance with state regulations which could impact the agency's licensing. "Most importantly is that your negligence is putting children at risk." Arbitration Award p. 5. McKenzie was suspended for three days for his repeated inability to keep his records up to required standards.

Six months later, on July 25, 1997, McKenzie's supervisor issued to him a memorandum identifying eleven files lacking dictation. McKenzie was put on notice that non-current files were to be brought into compliance "immediately." McKenzie's August 1997 performance evaluation, however, was "middle good" and noted personal difficulties experienced by

McKenzie over the year which included a divorce and a custody and support dispute. Arbitration Award pp. 5–6.

Thereafter, on August 16, 1997, McKenzie was involved in an incident with his 13–year–old son and his son's mother. Specifically, charges of harassment were filed against McKenzie at the request of the son's mother. The incident was publicized in the local newspaper which reported that McKenzie was charged with striking his son with his hands and leaving red marks on his son's arms and neck. The report proved to be an embarrassment to CYS. As a result of this incident, the administrator suspended McKenzie with pay for ten days pending an investigation into the incident. On September 2, 1997, the administrator gave written notice to McKenzie that his suspension was converted into a written warning.[2] Arbitration Award pp. 6–7.

In the interim, while McKenzie was on suspension, a serious incident arose on August 27, 1997, concerning a child and family for whom McKenzie was the caseworker. Specifically, a caseworker who was on call for emergencies and who was required to address the matter, found no dictation in the file since December 1996 and no court order on the case. A search of McKenzie's desk revealed a file that contained the order of the court but no recent records of CYS's involvement with the family. The next day at an emergency court hearing, CYS was not fully prepared due to the incomplete file. Arbitration Award p. 7. Again on September 9, 1997, after McKenzie had returned to his position, he mishandled a call from a local borough secretary regarding a problem with a mother and child. In this incident, McKenzie referred the caller to the mental health department in two separate telephone conversations. This direction was erroneous and a CYS intake supervisor ultimately handled the matter and made appropriate arrangements for the family. Arbitration Award pp. 7–8.

**2.** On November 21, 1997, the Pennsylvania Department of Welfare determined, after investigation, that the report lodged by McKenzie's son's mother against McKenzie was "unfounded" and would be expunged.

Thereafter, on October 15, 1997, McKenzie underwent knee surgery and was absent from work for a number of days during the month of October, exhausting his vacation and sick leave. Prior to his surgery, on October 1, 1997, McKenzie's supervisor became aware that McKenzie was "more deficient" and recommended that McKenzie be terminated. On November 21, 1997, the administrator suspended McKenzie without pay pending a pre-termination hearing. Arbitration Award p. 8. Based upon findings made at the hearing, McKenzie's suspension was converted to a discharge. CYS's notice of discharge dated December 8, 1997, explained that despite repeated counseling, warnings, and suspensions, McKenzie's work was deficient, including, but not limited to a failure to organize, document, and file information; a failure to maintain case dictation in a current manner; and a failure to complete CY–48 reports within Department of Public Welfare deadlines.[3] Arbitration Award p. 9.

McKenzie grieved his termination. More precisely, as a Caseworker I, McKenzie was represented by Appellees District 2, United Mine Workers of America and Local Union 9999, United Mine Workers of America (collectively, the "Union"). McKenzie, through the Union, filed a grievance contesting his dismissal as violative of the collective bargaining agreement between the Employer and the Union.[4] The parties failed to resolve the grievance through the first three steps of the dispute resolution process contained in the agreement, thus, they submitted the matter to arbitration.[5]

The parties chose Arbitrator John J. Morgan to resolve the dispute. Although the parties did not stipulate to a particular

[3]. A subsequent search of McKenzie's desk by his supervisor, on December 11, 1997, revealed 18 intake files dating back to August 1993 for which no disposition had been made.

[4]. Agreement between Greene County Children & Youth Services and United Mine Workers Union, AFL–CIO, effective March 1, 1997.

[5]. The parties' collective bargaining agreement contained a four-step dispute resolution procedure for resolving contractual disputes between the parties. Article XIX. This procedure, in conformity with Section 903 of PERA, 43 P.S. § 1101.903, culminates in a final step of which is "final and binding" arbitration. Article XIX, Section 1.

issue to be determined by Arbitrator Morgan, in his award, the arbitrator explained that the grievance arose from a dispute concerning McKenzie's discharge based on allegations of negligence and deficiencies in his job performance. Arbitrator Morgan also pointed to the Union Standard Multi-Purpose Grievance Form which stated the grievance as "I feel that I have been unjustly discharged and wish to be reinstated with all back pay and benefits. The Company has violated Article XIX, Section 9." [6] In sum, this provision of the collective bargaining agreement prohibits CYS from, among other things, discharging an employee without just cause.

In resolving this issue, Arbitrator Morgan, recognizing that the collective bargaining agreement between the parties did not define the concept of "just cause," noted that the "specific attributes of just cause cannot be stated categorically, but must be determined by the facts of each case." Arbitration Award p. 10. According to Arbitrator Morgan, however, the concept of just cause is generally recognized as including three elements. First, it must be determined whether the offense charged against the grievant is normally considered a serious enough offense to warrant the discipline imposed. Second, it must be determined, after considering all the evidence, including the credibility thereof and the inferences to be drawn there from, whether the record, taken as a whole, supports a finding that the employee has committed the offense. Finally, it is necessary to determine whether there are any mitigating or extenuating circumstances which warrant a finding that some penalty short of the discipline imposed is more appropriate, or the existence of any aggravating circumstances which justify the sanction when a lesser penalty might normally have been more appropriate. Arbitration Award p. 10–11.

**6.** Article XIX, Section 9, Discharge, Suspension, Discipline, provides in relevant part:

A. The County shall not demote, suspend, discharge, extend a probationary period or take any disciplinary action against an Employee without just cause. An Employee may appeal a demotion, suspension or discharge beginning at the third (3rd) step of the grievance procedure. The Union shall be notified by the County of any action taken pursuant to this Article.

As to the first element, Arbitrator Morgan found that the offense of failure to maintain files properly and to keep the files current could be considered serious enough to warrant discharge. Regarding the second element, the arbitrator determined that "there is no doubt of the grievant's guilt of the offense charged." Arbitration Award p. 12. Finally as to the third element, Arbitrator Morgan found both aggravating and mitigating circumstances that he considered in his determination of just cause. With respect to aggravating circumstances, the arbitrator first recognized that it was "critically important for the safety and well being of children in the CYS program that their case files contain current, correct, and complete information insofar as possible." Arbitration Award p. 12. Furthermore, Arbitrator Morgan rejected claims by the Union that McKenzie's personal system of case file management was satisfactory; that McKenzie was a victim of disparate discipline; that McKenzie should not be found at fault as there was no written policy regarding dictation, noting McKenzie's job description and various memoranda citing regulatory compliance requirements; and that CYS failed to apply progressive discipline, citing to the extensive written reprimands, warnings, and suspensions used to attempt to bring McKenzie's performance to par.

Arbitrator Morgan, however, also found certain mitigating circumstances. He noted that McKenzie's latest performance evaluation was "middle good" and that his supervisor's comments were generally positive, referring to McKenzie's "professional growth" and recognizing his "emotional and physical" concerns that impacted his performance. Other mitigating factors considered by Arbitrator Morgan were McKenzie's incident with his son, and resultant suspension, and his knee surgery, which limited his availability to bring his files into compliance. Arbitration Award pp. 14–15.

After consideration of the aggravating and mitigating circumstances surrounding McKenzie's discharge, Arbitrator Morgan concluded that the termination should be modified to a suspension, without back pay or benefits, but with no loss of seniority, and that McKenzie be reinstated in a "last chance"

status in which he was required to ensure that his files were current and complied with agency policy.

CYS petitioned the Court of Common Pleas of Greene County to vacate the arbitrator's award. According to CYS the award was erroneous and CYS cited cases supporting the proposition that pursuant to the collective bargaining agreement, once the arbitrator found that McKenzie had engaged in the misconduct for which he was terminated, the arbitrator was bound to uphold the discipline imposed by CYS-termination. The Court of Common Pleas vacated the arbitrator's award. Specifically, the court applied the essence test, the standard of review of an arbitration award by which an award will be upheld if it draws its essence from the collective bargaining agreement. Recognizing the heavy burden on the party who seeks to vacate an arbitrator's award, and the parties' bargain for the arbitrator to define "just cause" when that term is not defined, the court nevertheless concluded that where the legislature had promulgated extensive and detailed record keeping requirements, a function that was important to the operation of the agency, the local agency had no authority to bargain away its responsibility to maintain those records in the required manner. Court of Common Pleas Opinion at p. 10. Thus, the Court of Common Pleas vacated the arbitrator's award and upheld McKenzie's termination.

The Union appealed to the Commonwealth Court which affirmed the Court of Common Pleas' determination. The Commonwealth Court majority used a slightly different calculus in affirming the lower tribunal. Specifically, the Commonwealth Court offered that an arbitrator is not free to modify the discipline imposed by the employer where it would be "manifestly unreasonable" to conclude that an employer bargained away its right to discharge an employee for particularly egregious offenses. The Union sought allowance of appeal from our Court.

In the interim, our Court decided *State System of Higher Education (Cheyney University) v. State College University Professional Association (PSEA–NEA)*, 560 Pa. 135, 743 A.2d 405 (1999) in which we rejected the broader, less deferential

"manifestly unreasonable" standard of review of an arbitrator's award. In *Cheyney University*, we reaffirmed the limited nature of the essence test and the concomitant great deference to be accorded a grievance arbitrator's award. In light of this pronouncement, we granted the Union's petition for allowance of appeal and remanded the matter for reconsideration by the Commonwealth Court in light of our decision in *Cheyney University*.

On remand, the Commonwealth Court panel concluded that while they found the arbitrator's award to be unjustified and in its view "incorrect," because the award could be rationally derived from the collective bargaining agreement, it must be upheld on appeal. In doing so, the Commonwealth Court suggested that in *Cheyney University*, our Court retreated from its prior position of finding that an arbitrator does not have the authority to overturn discipline meted out by an employer against employees who "threaten their ability to perform their public duty." Thus, the Commonwealth Court reversed the order of the Court of Common Pleas and reinstated the arbitrator's award. *Greene County v. District 2, United Mine Workers of America*, 778 A.2d 1259 (Pa.Cmwlth. Ct.2001).

The Employer filed a petition for allowance of appeal and we granted allocatur to address whether the Commonwealth Court erred in upholding the arbitrator's award. In support of its position that the Commonwealth Court improperly upheld the arbitrator's award, the Employer offers two primary arguments. First, the Employer maintains that where the arbitrator determines that there is just cause for the discharge of the grievant, that it determines that the grievant engaged in the misconduct, the arbitrator must uphold the penalty imposed by the employer. Second, the Employer asserts that an arbitrator cannot render a decision in which it finds that a public employer bargained away its right to terminate an employee who is guilty of misconduct which jeopardizes the very function and mission of the public agency. After setting forth the appropriate framework by which to

review a grievance arbitrator's award rendered under PERA, we will address these arguments *seriatim*.

Both parties agree that the circumscribed standard of review coined the "essence test" is the appropriate standard to be employed by an appellate court when it reviews a grievance arbitrator's award rendered under PERA. In *Cheyney University*, we reaffirmed the deferential nature of the essence test and stressed that this limited review of an arbitrator's award was born from concerns for industrial peace, informality, speed, lack of expense, and finality. Furthermore, we explained in *Cheyney University*, that the essence test consists of two inquiries. First, we ask whether the issue submitted to arbitration, as properly defined, is encompassed within the terms of the collective bargaining agreement. *Id.* at 413. Second, we inquire into whether the arbitrator's award can be rationally derived from the collective bargaining agreement. *Id.* A court will vacate an arbitrator's award, we elaborated, only where the award indisputably and genuinely is without foundation in, or fails to flow logically from, the collective bargaining agreement. *Id.* If the arbitrator's award can rationally be derived from the terms of the collective bargaining agreement, it must be upheld. *Id.* Thus, it is this two-prong essence test that we will apply in this appeal.

To apply the essence test properly, and to determine whether the Commonwealth Court erred in its analysis, we must initially review the terms of the collective bargaining agreement. As noted above, the collective bargaining agreement between the parties provides that CYS shall not discharge an employee without just cause. Article XIX, Section 9. Related thereto, CYS "has the exclusive right and power to manage, control and conduct its business" and this includes the right to "discharge or demote its Employees for just cause and to make rules relating to operations as it deems advisable, subject, however, to the provisions of this Agreement and except as limited by law." Article V, Section 1. The contract also states that a grievance is a dispute concerning the interpretation, application, or alleged violation of the agreement, Article

XIX, Definition, and that grievances are to be resolved through a four-step procedure culminating in binding arbitration. Article XIX, Section 1. Finally, the agreement addresses the authority of the arbitrator: "The arbitrator shall have no power or authority to add to, subtract from, or modify the provisions of this Agreement in arriving at a decision of the issue(s) presented and shall confine his decision solely to the application and interpretation of this Agreement." Article XIX, Section 1(D)(1).

■ With these terms in mind, we turn to the first prong of the essence test, viz., whether the issue submitted to arbitration, as properly defined, is encompassed within the terms of the collective bargaining agreement. Based upon the above-noted terms of the collective bargaining agreement which prohibit termination without just cause and which provide for a grievance and arbitration procedure for settling disputes arising under the contract, we find that the issue submitted to arbitration, as properly defined, was encompassed within the terms of the collective bargaining agreement.

■ Next we consider the second prong of the essence test—whether the arbitrator's determination can be rationally derived from the collective bargaining agreement. In contending that the arbitrator's award is not rationally derived from the collective bargaining agreement, CYS argues that although the collective bargaining agreement between the parties does not explicitly define just cause, once the arbitrator found that McKenzie engaged in the misconduct for which he was terminated, the arbitrator was required to find just cause and to uphold McKenzie's discharge and the arbitrator was without the authority to alter the discipline imposed by the Employer.

We addressed a strikingly similar issue in our decision in *Office of the Attorney General v. Council 13, American Federation of State County and Municipal Employees, AFL–CIO*, 844 A.2d 1217 (Pa.2004). In *Office of the Attorney General*, an arbitrator's award reinstating a discharged employee was challenged by the employer. The collective bargaining agree-

ment between the employer and the union prohibited the termination of an employee without just cause, but it did not define this term. We applied the essence test and determined that where a contract term is undefined, the parties bargained for the arbitrator's interpretation of the term to resolve the parties' dispute, including the term "just cause." We further noted that the term "just cause" was not capable of concrete definition but may be generally understood to include a number of factors such as a grievant's past employment record, length of service, post-discharge rehabilitation, and unequal treatment of other employees for similar misconduct. The arbitrator's consideration of mitigating circumstances such as disciplinary actions taken against other similarly-situated employees and substance abuse rehabilitation, in finding that the grievant in that case was not terminated for just cause was rationally derived from the collective bargaining agreement considering the undefined term just cause, the role of the arbitrator in interpreting the terms of the collective bargaining agreement and the concept of just cause as properly understood.

Although the parties now before us did not have the benefit of *Office of the Attorney General*, we find that decision to be dispositive of CYS's argument. Applying the analysis utilized in *Office of the Attorney General* to this case, we find the parties placed before the arbitrator the undefined provision permitting discharge only for "just cause" and requested the arbitrator's interpretation of that provision. In construing this provision, Arbitrator Morgan explained his interpretation of the term just cause and determined that it included consideration of mitigating and aggravating circumstances such as McKenzie's performance evaluations, and emotional and physical challenges facing McKenzie at this time. Based upon the undefined term "just cause," the parties' bargained-for role of the arbitrator to interpret the terms of the collective bargaining agreement, and the general understanding that the concept of just cause may include consideration of mitigating circumstances, we conclude, as we did in *Office of the Attorney*

*General,* that in this respect, the arbitrator's award was rationally derived from the collective bargaining agreement.

This conclusion, however, does not end our inquiry. CYS also asserts that the arbitrator's award was not rationally derived from the collective bargaining agreement because a public employer cannot bargain away the right to terminate an employee found to have committed serious misconduct that jeopardizes the core function and mission of that public agency. In support of this contention, CYS cites to our decision in *City of Easton v. American Federation of State, County and Municipal Employees, AFL–CIO, Local 447,* 562 Pa. 438, 756 A.2d 1107 (2000). We find CYS's argument to be persuasive.

In *City of Easton,* the City of Easton terminated an employee for, *inter alia,* holding a second job with a security company, and submitting time sheets to both employers for the same hours worked to collect double pay. The employee grieved his dismissal. An arbitration board found that the employee had committed either a theft against the City itself or the security company while he was working for the City, but nevertheless reinstated the employee with back pay, finding that the City had failed to prove that the employee's misconduct provided just cause for his termination because the evidence presented failed to establish that the employee had stolen time from the City or from the security company. On appeal, we vacated the arbitration board's award.

Initially, we reaffirmed the deferential essence test as the proper standard by which to review the award, but explained that this usual degree of deference to be accorded an arbitrator's award is moderated in a situation in which the arbitrator's interpretation of the agreement led to the governmental employer relinquishing essential control over the public enterprise, i.e., those powers essential to its ability to discharge its functions. *Id.* at 1111.

Specifically, we pointed out that the collective bargaining agreement between the parties included a schedule of discipline which provided that an employee could be immediately dismissed for "willful misconduct." The board determined

that the employee was guilty of theft. Cognizant of our prior cases emphasizing the need for government to control its powers that are essential to the proper discharge of the functions entrusted to that governmental body and recognizing that governmental authorities simply do not have the freedom of private enterprises to discontinue or bargain away the control over such functions, we held that the arbitrator's determination could not be rationally derived from the collective bargaining agreement as it compelled a governmental entity to relinquish essential control over the enterprise. *Id.* Thus we vacated the arbitrator's award.

█ The rationale expressed in our decision in *City of Easton* is rooted, in part, in the unique nature of the public employer in our Commonwealth. *Id.* Unlike private sector employers, public employers are ultimately responsible for the health, safety, and welfare of our communities. Due to their unique nature and role, public employers must be able to perform the functions they are charged to carry out by our citizenry. Consistent with this status, our Court has recognized that public employers cannot be compelled in arbitration to relinquish powers that are essential to the proper discharge of their functions. *Id.* Thus, while as a general proposition, an arbitrator has broad authority to interpret an undefined provision regarding termination for just cause in a collective bargaining agreement, *Office of the Attorney General,* to permit an arbitrator to interpret the agreement as to require reinstatement of an employee who was determined to have engaged in egregious misconduct that strikes at the very core function of the public enterprise would be to deprive the employer of its ability to discharge that essential function. *City of Easton,* 756 A.2d at 1111–12. An arbitrator's award granting reinstatement in such a situation would not be rational and would therefore fail the essence test.

Here, Arbitrator Morgan determined that McKenzie had repeatedly violated CYS policy and state regulations for which he was initially reprimanded and ultimately discharged. The arbitrator also recognized the importance that recordkeeping plays in the services that CYS provides to the residents of the

community, and even acknowledged that McKenzie's failure to document his files placed the safety of the children involved with CYS at risk. Ultimately though, the arbitrator interpreted the contract's just cause provision to permit consideration of mitigating circumstances and reinstated McKenzie to his former position.

What the arbitrator did not take into account was that McKenzie's chronic and serious misconduct in failing to properly document, even after progressive discipline designed to bring his performance to acceptable levels, went to the core function of CYS as a public agency.[7] The requirements of accurate and timely file keeping are mandated by regulation,[8] are required for licensing, are an inextricable and essential part of the services provided by CYS to the community, and are necessary for the physical well-being of the children served by CYS. In this case, the essential nature of the filing requirements was made manifest when McKenzie's performance shortcomings placed the safety of children at serious risk of harm. The arbitrator's award reinstating McKenzie to his position took from CYS the power to discharge its core functions, a power that a public employer does not have the freedom to relinquish. *Id.* at 1112. Applying the above-stated principles established in *City of Easton* to the facts before us, we find that the arbitrator's award in this case was not rationally derived from the collective bargaining agreement.

For the above-stated reasons, we reverse the order of the Commonwealth Court and reinstate the order of the Court of Common Pleas of Greene County which vacated the arbitrator's award.

Former Chief Justice ZAPPALA did not participate in the decision of this case.

7. The failure of an arbitrator's award to pass the essence test under *City of Easton* is not limited to situations in which an employee's proven misconduct is criminal as to his employer. *Id.* at 1111 n. 3.

8. *See e.g.,* 55 Pa.Code §§ 3130.21(b); 3130.31; 3130.43; 3130.61.

Justice NIGRO files a concurring opinion.

Justice SAYLOR files a concurring opinion in which Justice EAKIN joins.

Justice NIGRO, concurring.

I agree with the majority's application of the essence test here and write separately merely to emphasize that in my view, this Court's decision in *City of Easton v. American Federation of State, County and Municipal Employees*, 562 Pa. 438, 756 A.2d 1107 (2000), did not wholly supplant the application of the essence test in cases in which a core function of a public employer has been implicated. Rather, as this court unanimously stated in *Office of the Attorney General v. Council 13, American Federation of State, County and Municipal Employees, AFL–CIO*, our decision in *City of Easton* " 'reaffirmed the deferential essence test,' and simply 'noted that this usual deference is *tempered* in a situation in which the arbitrator's interpretation of the agreement led to the governmental employer relinquishing essential control over the public enterprise ....' 844 A.2d 1217, 1225 (Pa.2004) (emphasis added); *see also* Maj. Op. at 13–14 (stating that 'the usual degree of deference to be accorded to an arbitrator's award is moderated' " in such situations) (emphasis added). Thus, like the majority here, I believe that the essence test remains applicable in cases such as this one, albeit in a slightly modified form.

Justice SAYLOR, concurring.

As suggested by the dissent in *City of Easton v. American Fed'n of State, County and Mun. Employees, AFL–CIO, Local 447*, 562 Pa. 438, 756 A.2d 1107 (2000), the core functions doctrine fashioned in that case is inherently incompatible with an exclusive focus on rational derivation from the collective bargaining agreement, as reflected in the essence test as developed by this Court. *See id.* at 451, 756 A.2d at 1114 (Cappy, J., dissenting). *See generally State Sys. of Higher Educ. (Cheyney Univ.) v. State College Univ. Prof'l Ass'n (PSEA–NEA)*, 560 Pa. 135, 150, 743 A.2d 405, 413 (1999)

(articulating the essence test). For this reason, although I certainly respect the majority's effort, I believe that it is ultimately unsuccessful in its attempt to couch the result of this case in terms of a reasoned application of the essence test. In my view, *City of Easton* supplants the essence test, in favor of something akin to the otherwise discredited manifest unreasonableness standard, for certain cases arising in the public sector in which the employer's core functions can be said to be implicated by the arbitrator's decision. As I am bound by *City of Easton,* I concur in the result.

Justice EAKIN joins this concurring opinion.