The CITY OF PITTSBURGH and
The Pittsburgh Joint Collective
Bargaining Committee

v.

Mark BRENTLEY

Appeal of: The City of Pittsburgh.

Commonwealth Court of Pennsylvania.

Argued May 8, 2007.
Decided May 30, 2007.

Diego Correa, Pittsburgh, for appellant.

Howard Grossinger, Pittsburgh, for appellee, Pittsburgh Joint Collective Bargaining Committee.

BEFORE: COLINS, Judge, PELLEGRINI, Judge, and FRIEDMAN, Judge.

OPINION BY Judge FRIEDMAN.

The City of Pittsburgh (City) appeals from the May 2, 2006, order of the Court of Common Pleas of Allegheny County (trial court), which affirmed the July 12, 2005, decision and award of Arbitrator Dennis E. Minni (Arbitrator) reinstating the employment of City employee Mark Brentley (Grievant). At issue was whether the City's disciplinary discharge of Grievant for unexcused absence was proper under the "just cause" standard for employee discharges agreed to in the collective bargaining agreement (CBA) between the City and the Pittsburgh Joint Collective Bargaining Committee (Union).[1] We also affirm.

The Arbitrator's findings can be summarized as follows.[2] Grievant has worked for

---

1. The Union is a labor organization certified by the Pennsylvania Labor Relations Board as the collective bargaining representative for a unit of the City's employees that included Grievant.

2. As noted by the trial court, there are no transcripts from the proceedings before the Arbitrator, and the City does not challenge the Arbitrator's findings of fact. (Trial ct. op. at 3, R.R. at 316.)

the City since 1985, most recently in the laborer classification at the City's Department of Public Works. On July 22, 2003, while Grievant was working as an acting driver with an asphalt crew, two co-workers reported Grievant to the acting foreman over discord on the crew.[3] The foreman refused Grievant's request to give up the acting driver position and resume laborer responsibilities, and, although Grievant phoned the Department of Public Works, he was unable to reach anyone with the authority to grant his request. In frustration, Grievant threw his cell phone against a City truck and walked away from the job site.

Grievant immediately felt chest pains, began sweating profusely and became emotionally upset to the point of tears. He tried unsuccessfully to reach his supervisor, and he called the City's Employee Assistance Program (EAP), which took Grievant's insurance information and gave Grievant the name of someone who could counsel him. Although Grievant received several follow-up phone calls, the earliest doctor's appointment he could obtain was three weeks later. Grievant called his supervisor for time off, using a week of vacation time, and he called in to work daily to report his status. Grievant's emotional state worsened throughout July of 2003; he became sleepless, irritable, and

he suffered headaches and bouts of weeping.

Subsequently, Grievant began treatment for his symptoms and spoke with the City's EAP contact person, but he did not return to work. Grievant received a letter, dated August 8, 2003, advising him that he would not be paid for the time he had taken off and suggesting that he apply for a leave of absence. (R.R. at 23.) Grievant applied for leave under the Family and Medical Leave Act[4] (FMLA), which was approved. (R.R. at 30–31.) He also applied for short-term disability (STD) benefits with Hartford Life and Accident Insurance Company (Hartford), the City's STD carrier. Grievant saw his physician, Dr. Sudha Sundaram, on August 13, 2003, and she placed Grievant on temporary disability status from July 22 to August 22, 2003. (R.R. at 2.)

On September 23, 2003, the City sent Grievant a written notice of suspension with intent to discharge based on his unexcused absence from work and issued a discharge letter on October 3, 2003. (R.R. at 32, 57.) However, by letter from the City Solicitor dated October 10, 2003, Grievant was reinstated under the rationale that he was on FMLA leave until October 15, 2003.[5] The reinstatement let-

---

3. Grievant felt that the difficulties stemmed from his position on the Pittsburgh School Board, which undermined his supervisory efforts with his crew. Grievant's election to the Pittsburgh School Board in 1999 initially threatened his continued employment with the City; however, ultimately, City employees were allowed by law to serve in certain elected capacities, including as School Board member.

4. 29 U.S.C. §§ 2601–2654.

5. The reinstatement letter offered the following explanation for the City's decision to terminate, and then reinstate, Grievant: (1) Grievant was granted FMLA leave on Septem-

ber 3, 2003, subject to approval of his STD claim; (2) because the length of Grievant's STD benefits was not known at the time, the FMLA leave had no termination date; (3) on September 17, 2003, Grievant received retroactive approval for his STD claim for the period ending August 21, 2003; (4) without additional documentation, the City assumed that Grievant's FMLA leave also expired on August 21, or on September 17, 2003, at the latest, thus triggering the disciplinary action against Grievant for failure to return to work; however, (5) because of the confusion regarding the length of Grievant's leave, the City determined that Grievant's FMLA leave would extend until October 15, 2003, when the

ter also informed Grievant that, by October 15, 2003, the City expected Grievant either to return to work, terminate his employment or qualify for further disability coverage. (R.R. at 61–63.)

Grievant did not return to work on October 15; however, to justify the continued absence, a letter evidencing Grievant's ongoing disability was sent to the City Solicitor from Laura Swearingen, Ph.D. The letter, dated October 29, 2003, stated that Grievant had been Dr. Swearingen's patient since October 14, 2003, and that Dr. Ionna Shirley, a psychiatrist, recommended that Grievant remain under Dr. Swearingen's care for a minimum of six months. Dr. Swearingen also noted that Grievant had applied to Hartford for further STD coverage, and she left a contact number in case the City required any other information. (R.R. at 72–74.)

On October 31, 2003, Hartford notified Grievant that the documentation he provided was insufficient to extend his STD benefits beyond August 21, 2003. (R.R. at 111.) Grievant contacted Hartford on numerous occasions with regard to sending additional medical information, (R.R. at 112–166); however, the material sent by Grievant still was deemed insufficient, and by letter dated November 18, 2003, Hartford explained its denial of further STD benefits to Grievant. (R.R. at 82–85.) Although informed of Hartford's no-cost appeal process, Grievant did not appeal Hartford's decision.

On November 14, 2003, the City once again sent Grievant a written notice of suspension with intent to discharge for

violation of sections 8(B)(3)(a) and (b) of the CBA.[6] Specifically, the City claimed that Grievant: (1) failed to comply with the City's requests for medical documentation to explain his absence from August 22, 2003, through October 13, 2003; and (2) failed to provide adequate information to Hartford to extend STD benefits for the period commencing October 14, 2003. (R.R. at 75–77.) By letter dated December 2, 2003, the City discharged Grievant from his position of laborer in the City's Department of Public Works based on Grievant's unauthorized absence from work. (R.R. at 86–88.)

On December 11, 2003, Grievant, through the Union, filed a grievance, and the matter ultimately went to voluntary labor arbitration. The issue set forth by the Arbitrator was: "Did the City of Pittsburgh have just cause to suspend then discharge the Grievant from its Laborer classification for abuse of sick leave? If not, what shall the remedy be?" (R.R. at 226.)

On July 12, 2005, the Arbitrator upheld the grievance and ordered Grievant reinstated. In doing so, the Arbitrator focused on the two predicates advanced by the City for Grievant's dismissal, i.e., (1) Grievant's failure to provide any excuse to explain his absence for the period from August 22, 2003, through October 13, 2003, and (2) his failure to provide Hartford with sufficient documentation to obtain STD benefits after October 14, 2003. The City had characterized these two offenses as "obvious sick leave abuse." (R.R. at 229.)

---

twelve week entitlement to such leave would be fully exhausted. (R.R. at 61–63.)

**6.** Section 8–Seniority of the CBA states in relevant part:
    B. Continuous service shall be calculated and seniority shall be applied in conformance with the following:

. . .
(3) Continuous service shall be broken by:
(a) Quit—. . . Absence for ten (10) consecutive workdays without notice to the City shall constitute a quit.
(b) Discharge for just cause.
(R.R. at 257–58.)

With respect to the first offense, the Arbitrator found no support for the City's *ex post facto* demand for proof of disability to support a FMLA derived leave of absence granted to Grievant weeks earlier. (Arbitrator's decision at 10, R.R. at 234.) As to the second offense, the Arbitrator determined that the City could not justify firing Grievant based on deficiencies in the documentation submitted in support of his STD claim. Noting that Grievant was not an employee of Hartford, the Arbitrator found that the only appropriate penalty for Greivant's failure to provide Hartford with sufficient medical documentation was a denial of his STD benefits, *not* disciplinary action by the City. The Arbitrator reasoned that "nothing in the CBA links an STD carrier's decision with disciplinary prerequisites or how seniority may be adversely affected." [7] (Arbitrator's decision at 12, R.R. at 236.) In fact, the Arbitrator found that given Grievant's persistent efforts to obtain professional assistance for his mental problems and related physical symptoms, there was no convincing evidence that Grievant's conduct indicated dilatory or fraudulent motivation or an "abject refusal to return to work since the incident," as argued by the City. (Arbitrator's decision at 10, R.R. at 234.) The Arbitrator also rejected the City's claim that Grievant's intent to "milk the system" encouraged co-workers to use up accumulated leave benefits or to go on FMLA leave.[8] (*Id.*) Thus, the Arbitrator determined that the City did not meet its burden of proof for a discharge case because the City failed to establish by a clear and convincing margin of evidence that there

was "just cause," as that term is used in the CBA, to end Grievant's seniority. Accordingly, the Arbitrator granted the grievance to the extent that Grievant sought reinstatement to his former position.

As to Grievant's claim for "full back pay," the Arbitrator noted that back pay can be awarded only for work opportunities lost by a grievant who was ready, able and willing to perform his or her job duties. Because Grievant did not demonstrate exactly when he was able to resume his duties with the City, the Arbitrator concluded that there could be no wages restored until Grievant either returns to work under medical clearance or shows an earlier date when such medical clearance was in hand. The Arbitrator retained jurisdiction over the matter for thirty days "in order to assist the parties reach an orderly and equitable implementation of this award." (Arbitrator's decision at 13, R.R. at 237.)

On August 12, 2005, the City filed a statutory appeal from the Arbitrator's decision, and, following the submission of briefs and oral argument, the trial court denied the City's appeal by order dated May 2, 2006. Subsequently, the City filed a Pa. R.A.P. 1925(b) statement, and the trial court provided an opinion addressing the issues raised therein. The City now appeals to this court.

■ As a threshold matter, the City argues that by failing to appeal Hartford's denial of his STD claim, Grievant removed the current matter from the jurisdiction of the Arbitrator and the courts. The City

---

7. In fact, the Arbitrator specifically noted that section 12(F) of the CBA, (R.R. at 280–81), allows an employee to apply in writing for up to ninety days of unpaid leave, renewable for another ninety days, so long as all paid leave has been exhausted. (Arbitrator's decision at 12, R.R. at 236.)

8. The Arbitrator pointed out that there was no financial advantage to be had given the fact that leave under the FMLA is unpaid. (Arbitrator's decision at 10, R.R. at 234.)

contends that, because the CBA requires disability issues to be handled in accordance with Hartford's policies, Grievant may not ignore this bargained-for appeal procedure and proceed via the grievance process. The Union counters that because the City raises this issue for the first time in its brief to this court, the issue is waived, and, in any event, the issue has no merit. We agree with the Union.

■ The City did not raise this issue before the Arbitrator, before the trial court or in its Rule 1925(b) statement; because the City raises this issue for the first time in its brief to this court, it is waived. *Donohue v. Arrowhead Lake Community Association,* 718 A.2d 904 (Pa. Cmwlth.1998); *Lower Paxton Township, Board of Supervisors v. Okonieski,* 153 Pa.Cmwlth. 36, 620 A.2d 602 (1993). Moreover, even if this issue were not waived,[9] it must fail. The grievance filed by the Union *did not challenge Hartford's decision to deny STD benefits* to Grievant. Rather, the grievance was a *challenge to the City's decision to discharge Grievant,* a matter clearly within the jurisdiction of the Arbitrator. This jurisdiction is not defeated merely because the City based its

"just cause" dismissal of Grievant in part on Grievant's failure to obtain STD benefits from Hartford. Although the denial of STD benefits may have been integral to the City's decision to terminate Grievant, Grievant's failure to appeal Hartford's decision means only that the denial of STD benefits must be upheld. It does not impact upon the jurisdiction of the Arbitrator or the courts to consider the merits of the grievance challenging Grievant's discharge by the City.[10]

■ Next, the City argues that the Arbitrator's decision and award are not rationally derived from the CBA and, therefore, must be reversed. Specifically, the City maintains that an employee's extended, unexcused absence from the workplace constitutes misconduct bearing directly upon the performance of a core public function, thus precluding an arbitrator's reversal of the disciplinary dismissal. We disagree.

■ The appropriate standard to be employed when an appellate court reviews an arbitrator's decision is known as the "essence test." In *State System of Higher Education (Cheyney University) v. State*

9. The City contends that, as a challenge to subject matter jurisdiction, this issue cannot be waived and may be raised at any stage in the litigation. *Alexander v. Department of Transportation,* 583 Pa. 592, 880 A.2d 552 (2005). The City also contends that, even if the issue could be waived, the City did not waive it here. The City claims that it raised the issue of jurisdiction before the Arbitrator at the earliest possible opportunity and cites pages 9 and 10 of its brief to the Arbitrator in support of this statement. (R.R. at 175–76.) However, on the cited pages, the City maintains that Grievant *waived his right to contest Hartford's denial of STD benefits* by failing to appeal Hartford's decision (something Grievant does not deny), and the City never alleges that the Arbitrator lacks jurisdiction to consider the merits of Grievant's discharge by the City.

10. The City relies on *Borough of Ambridge Water Authority v. Columbia,* 458 Pa. 546, 328 A.2d 498 (1974), to support its contrary position. In *Ambridge,* the issue was whether a particular dispute that arose between the parties to an employment contract had to be resolved through arbitration pursuant to the terms of that contract, or whether it could be decided by the courts. Our supreme court held, *inter alia,* that where there was a mutual agreement to arbitrate future disputes between the parties, any claim was to be determined under the contract's arbitration clause, not by the courts. We fail to see how this case is "on point" or "indistinguishable" from the present matter. (See City's brief at 15.) Further, to the extent that it applies at all, this case does not appear to support the City's claim that the Arbitrator lacked jurisdiction to consider Grievant's discharge.

*College University Professional Association (PSEA–NEA)*, 560 Pa. 135, 743 A.2d 405 (1999), our supreme court stressed the deference to be accorded to the award of the arbitrator chosen by the parties, noting that, in the vast majority of cases, the arbitrator's decision is final and binding, the lone exception being where the arbitrator's award does not draw its essence from the collective bargaining agreement. As set forth in *Cheyney University*, the essence test entails a two-prong analysis. First, the court must determine if the issue submitted to arbitration, as defined, is encompassed within the terms of the collective bargaining agreement. Second, if the issue is embraced by the agreement, the award will be upheld if the arbitrator's interpretation can rationally be derived from the agreement. *Id.* A reviewing "court will only vacate an arbitrator's award where the award indisputably and genuinely is without foundation in, or fails to logically flow from, the collective bargaining agreement." *Id.* at 150, 743 A.2d at 413.

■ In addition, a variation of the essence test is applicable when the appellate court reviews an arbitrator's award rendered under the Public Employe Relations Act.[11] Under what is known as the "core function test," the usual degree of deference accorded to an arbitrator's award is moderated. *Greene County v. District 2, United Mine Workers of America*, 578 Pa. 347, 852 A.2d 299 (2004); *City of Bradford v. Teamsters Local Union No. 110*, 901 A.2d 1103 (Pa.Cmwlth.2006). In *Greene County*, our supreme court explained the rationale behind the core function test, stating

Unlike private sector employers, public employers are ultimately responsible for the health, safety and welfare of our communities. Due to their unique nature and role, public employers must be able to perform the functions they are charged to carry out by our citizenry. Consistent with this status, our Court has recognized that public employers cannot be compelled in arbitration to relinquish powers that are essential to the proper discharge of their functions. Thus, while as a general proposition, an arbitrator has broad authority to interpret an undefined provision regarding termination for just cause in a collective bargaining agreement, to permit an arbitrator to interpret the agreement as to require reinstatement of an employee *who was determined to have engaged in egregious misconduct that strikes at the very core function of the public enterprise* would be to deprive the employer of its ability to discharge that essential function. An arbitrator's award granting reinstatement in such a situation would not be rational and would therefore fail the essence test.

*Id.*, 578 Pa. at 362, 852 A.2d at 308 (citations omitted) (emphasis added).

Here, the City argues that the trial court erred in upholding the Arbitrator's award under the core function test.[12] According to the City, because "there exists

---

11. Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. §§ 1101.101–1101.2301.

12. As to the essence test, the trial court concluded that the first prong of the essence test is satisfied because the issue before the Arbitrator, i.e., whether the City had "just cause" to discharge Grievant, was within the terms of the CBA between the parties, which specifically states that the City must have "just cause" to discipline or discharge an employ-

ee. *See* CBA, section 8(B)(3)(b). The trial court determined that the second prong of the essence test also was satisfied in that the Arbitrator's resolution of the case was rationally derived from the CBA after careful consideration of the evidence and contentions of the parties and interpretation/application of the contractual "just cause" standard set forth in the CBA. The City does not challenge this portion of the trial court's decision.

no conduct which has more serious consequences with respect to a public agency's core functions than the employee who simply fails to report for work," (City's brief at 17), the City could not bargain away its power to fire an employee for lack of attendance. Thus, the City maintains that the Arbitrator's award reversing the City's decision to terminate Grievant for such misconduct does not draw its essence from the CBA and must, as a matter of law, be vacated.

In making this argument, the City relies on a number of cases in which the trial court applied the core function test and reversed an arbitrator's award reinstating an employee to work after the public employer discharged the employee for misconduct. However, these cases are easily distinguished from the present matter in that, in each instance, the arbitrator found that the employee was, in fact, guilty of the serious misconduct with which he was charged and for which he was terminated.[13] In contrast, the Arbitrator here specifically found that Grievant did *not* "simply refuse to work," as charged by the City but, rather, continually sought professional assistance and treatment for the mental

---

**13.** In *Greene County*, an employee of the County's Children and Youth Services (CYS) was terminated for poor record keeping and case mismanagement. The arbitrator determined that there was no doubt that the employee engaged in the misconduct for which he was terminated and acknowledged that the employee's actions placed the safety of the children involved at serious risk; nevertheless, the arbitrator reinstated the employee based on mitigating circumstances. Our supreme court held that because the employee's chronic and serious misconduct went to the core function of CYS as a public agency, the arbitrator's award was not rationally derived from the parties' collective bargaining agreement.

In *Allegheny County Airport Authority v. Construction General Laborers and Material Handlers Union*, 874 A.2d 1250 (Pa.Cmwlth. 2005), an employee of the Authority was terminated for insubordination and serious breach of trust for falsifying work records and improper use of his security badge. The arbitrator found that the employee had, in fact, committed the acts cited by the Authority as the bases for his discharge; nevertheless, the arbitrator reinstated the employee based on mitigating factors. We reversed, holding that the employee's conduct amounted to a theft of services and serious breach of trust that struck at the core of the Authority's ability to operate a safe and secure airport.

In *City of Bradford,* an employee of the City was terminated for violating a provision in the collective bargaining agreement against theft of property after he stole money from a purse found in an open garbage bag while he was collecting garbage. The arbitrator found that the employee committed the theft as charged and conceded that it was a serious offense that typically invokes severe disciplinary action, including removal; nevertheless, the arbitrator considered mitigating circumstances and reinstated the employee. In holding that the arbitrator's award did not satisfy the core function test, this court concluded that because public trust in government is premised in part on the honesty of public employees, no municipality has the power to bargain away its power to terminate employees who steal from the employer itself, or steal from others while working for the employer.

In *Philadelphia Housing Authority v. American Federation of State, County and Municipal Employees, District Council 33, Local 934*, 900 A.2d 1043 (Pa.Cmwlth.2006), an employee of the Authority was terminated for sexual harassment of a co-employee. The arbitrator found that the employee committed repeated acts of sexual misconduct but determined that certain mitigating circumstances militated against termination. In reviewing the arbitrator's award under the core function test, this court determined that sexual harassment of the sort involved, which included physical assaults, fell into the category of misconduct that, if left unchecked, might lead the public agency to relinquish control of the orderly functioning of its operations. Concluding that the Authority lacked the power to bargain away its duty to protect its workforce from the type of conduct found by the arbitrator to have occurred, we held that the arbitrator's award was not rationally derived from the CBA.

and physical problems that prevented his return to the workplace. Under such circumstances, the Arbitrator's award reinstating Grievant based on a lack of "just cause" for his termination was rationally derived from the CBA and must be upheld.[14]

■ Finally, the City contends that the Arbitrator's decision must be reversed or, alternatively, the Arbitrator's award of back pay must be rescinded due to serious procedural irregularities. In a confusing argument, the City takes the position that the Arbitrator awarded back pay to Grievant based upon an August 10, 2005, letter from Dr. Swearingen confirming that Grievant was successfully treated and able to return to work on March 26, 2004. The City characterizes the submission of Dr. Swearingen's letter as the Union's *ex parte* introduction of evidence after the completion of fact-finding. According to the City, Grievant could have obtained this evidence of his recovery and presented it to the Arbitrator before the close of the record in January 2005, but did not do so. Consequently, the City asserts that the Arbitrator could not issue a decision in July 2005, and thereafter reopen the record to accept such evidence as a sole basis for an award of back pay, particularly where the City was never afforded an opportunity to ques-

tion the source of the evidence or challenge its veracity. We reject the City's unfounded assertions, and we agree with the trial court's determination that the City's challenge to the amount of back pay sought by the Union for Grievant is not a proper matter for resolution in the current proceedings. (Trial ct. order at 3, City's brief at 5.)

Initially, the City bases its argument solely on the August 10, 2005, letter from Dr. Swearingen, which was *obtained by the Union and submitted, not to the Arbitrator but to the City,* in accordance with the directions in the Arbitrator's decision and award. *There is absolutely no indication that the Arbitrator reopened the record to admit the letter,* as claimed by the City, and we reject the City's assertion that the Arbitrator's order included a specific award of back pay based on the date set forth therein. In fact, this letter is no longer a part of the record here because *the City,* which had attached the letter as an exhibit to its initial Trial Memorandum, moved to withdraw the exhibit, (R.R. at 374–75), and, in its Order of May 2, 2006, the trial court granted the motion and ruled that it "shall not be considered as part of the certified record in this case." (Trial ct. order at 1, City's brief at 3.)

---

**14.** Moreover, even if the Arbitrator had found that Grievant failed to provide the City with what it considered to be an adequate excuse for his absence from work, but found that discharge for this offense was unjustified, we agree with the trial court that such a result would be rationally derived from the CBA. An arbitrator may not interpret a collective bargaining agreement to require reinstatement of an employee who was determined to have engaged in the egregious misconduct that strikes at the very core function of the public enterprise and, thereby, deprive the employer of its ability to discharge that essential function. Greene County. However, we do not believe *this type* of conduct by Grievant would have impacted any alleged but uniden-

tified "core function or mission" of the City, particularly where the Arbitrator found that Grievant kept in touch with the City regarding his condition and found no evidence that Grievant ever advocated to co-workers that they should consider using up accumulated leave benefits or go out on FMLA leave in order to "milk the system." As the Union points out, "Taken to its illogical conclusion, such a premise suggests that a public employer could terminate any employee who is absent from work for even one day, for any reason, and that the core function rule would apply so that no labor arbitrator could consider whether there was just cause to support the discharge." (Union's brief at 16.)

Further, the trial court responded appropriately to the City's procedural argument. In its Order, the trial court stated:

> This statutory appeal proceeding involves a challenge by the City to the Decision and Award. As is customary and appropriate in such labor arbitration proceedings, Arbitrator Minni merely directed that [Grievant] be paid backpay by the City from the date when he was able to return to work after a period of disability. Post-award disputes between the parties concerning the specific amount of backpay which is appropriate to remedy the City's violation of the [CBA] are to be addressed by a submission back to Arbitrator Minni, who agreed to retain jurisdiction to hear and resolve any such disputes over the remedy. In the alternative, after exhaustion of all appeals by the City ... challenging the Decision and Award, the [Union] can challenge any City failure to abide by the Award by filing a charge of unfair labor practices with the Pennsylvania Labor Relations Board, pursuant to Section 1201(a)(8) of [PERA], ... 43 P.S. § 1101.1201 [ (a)(8) ], which makes it an unfair practice for a public employer to refuse to comply with the provisions of an arbitration award. *See Pennsylvania Labor Relations Board v. Commonwealth,* 478 Pa. 582, 387 A.2d 475 (1978).

(Trial ct. order at 4, City's brief at 6.) Thus, contrary to the City's assertions, the procedure used here was in no way irregular, and the City was not denied an opportunity to challenge Grievant's March 26, 2004, recovery date; in fact, the City was provided with two avenues to raise such a challenge.[15]

Accordingly, we affirm.

Judge COLINS dissents.

---

15. In this regard, we note that in its brief to this court, the City confirmed that it had in fact refused to pay any back pay award to Grievant. (City's brief at 21.)

*ORDER*

AND NOW, this 30th day of May, 2007, the order of the Court of Common Pleas of Allegheny County, dated May 2, 2006, is hereby affirmed.