Thomas R. ADAMS et al.

v.

CHRISTIE'S, INC. et al.

No. 2004–325–Appeal.

Supreme Court of Rhode Island.

July 18, 2005.

Joseph S. Larisa, Jr., for Plaintiff Frank Mauran.

Michael E. Salzman, New York City, for Defendant Christie's Inc.

William E. O'Gara, Providence, for Defendant Providence Athenaeum.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## O P I N I O N

SUTTELL, Justice.

The controversy underlying this appeal concerns a challenge to the Providence Athenaeum's proposed sale of its copy of the Double Elephant Folio of John James Audubon's *Birds of America* (Audubon folio) at public auction, pursuant to a consignment agreement with Christie's, Inc., dated February 24, 2003. The Superior Court civil action was filed by fifty-eight named individuals, all shareholders/members of the Providence Athenaeum, against the officers and directors of the Athenaeum, the Athenaeum in its corporate capacity, and Christie's. The plaintiffs alleged that the officers and directors were unlawfully elected in violation of the corporate charter, and thus lacked the legal capacity to enter the consignment contract; and that said officers and directors "have conducted themselves fiscally improperly, in a willful and wanton manner," and acted with hostility and disloyalty to the Athenaeum, thereby breaching their charitable trust and fiduciary duties. After a thirteen-day jury-waived trial, the trial justice, in a comprehensive written decision, denied the plaintiffs all requested relief, largely because of their failure to produce sufficient evidence to support their claims, dismissed the complaint in its entirety, and awarded the defendants their costs. Judgment was entered on August 23, 2004, from which one plaintiff, Frank Mauran (hereinafter referred to in the singular as plaintiff), appealed.

On appeal, plaintiff challenges only one aspect of the trial justice's decision. He asserts that the Athenaeum's current bylaws violate its charter in that they extend voting rights to nonshareholders. Thus, "the board that authorized the sale of the Athenaeum's crown jewel—James Audubon's 'Birds of America'—was unlawfully elected," and the contract with Christie's to auction the work was executed *ultra vires*. Because plaintiff further asserts that his appeal presents only a pure question of law, he has chosen not to provide this Court with any transcript of the proceedings below. We therefore accept as true all findings of fact made by the trial justice. Because we perceive from the record before us no irregularities in the adoption of the bylaws, we affirm.

## Background

Born on the island of Saint–Domingue (now Haiti) in the West Indies and raised in France, John James Audubon (1785–1851) arrived in New York in 1803 at the age of eighteen, and came to be one of America's leading naturalists and most renowned ornithologist. *See* Shirley Strechinsky, *Audubon Life and Art in the American Wilderness*, ch. 1 (N.Y. 1993). His most enduring legacy, however, is the collection of his " 'size of life' " [1] highly dramatic portraits of birds depicted in their natural habitats. In 1826, after nearly two decades of studying and drawing the avifauna of the American frontier, Audubon set sail from New Orleans to Liverpool with approximately four hundred of his drawings in search of an engraver. His quest met with success in Edinburgh in the person of William Home Lizars. On December 10, 1826, Audubon wrote in his journal:

1. Waldemar H. Fries, *The Double Elephant Folio, The Story of Audubon's Birds of America*, 7 (Chicago 1973).

"It is now a month since my work was begun by Mr. Lizars; the paper is of unusual size, called 'double elephant' and the plates are to be finished in such superb style as to eclipse all of the same kind in existence. The price of each number, which will contain five prints, is to be two guineas, and all individuals have the privilege of subscribing for the whole, or any portion of it." Waldemar H. Fries, *The Double Elephant Folio, The Story of Audubon's Birds of America,* 11 (Chicago 1973) (quoting 1 Maria R. Audubon, *Audubon and His Journals,* 179–80 (1897)).

The magnificent result is known as the Double Elephant Folio of *Birds of America.* Although his relationship with Lizars lasted but a year, Audubon was able to continue the project in London with Robert Havell, Jr. The original edition was not completed until 1838, by which time four hundred thirty-five plates had been issued. Although subscribers could purchase parts as issued, as well as complete sets, the plates generally were bound into four volumes.

As the trial justice noted, "[t]he Athenaeum is one of Providence's oldest and more venerable institutions." It is a private library that traces its origins to 1753, and was incorporated by act of the Rhode Island General Assembly in 1836 "generally to have and enjoy all the privileges and powers incident to corporations instituted for literary and scientific purposes."

On January 9, 1832, the subject of subscribing to *Birds of America* was considered by the board of trustees of the as yet unincorporated Athenaeum. "While the Board approved of the idea it was felt that subscription was not practical unless the cost could be defrayed without drawing upon the funds of the Institution." Waldemar H. Fries, at 301. Subsequently, twelve people agreed to advance $25 each "to defray the expense attendant on the purchase of the Plates," *id.* at 301–02, noting that "[i]t is deemed highly desirable by the Board of Trustees, that the Providence Athenaeum should be possessed of Audubon's great work on Ornithology, as being admirably calculated for giving a character to, and establishing permanently the reputation of the institution." *Id.* at 301. These people agreed to present the plates to the Athenaeum in return for " 'certificates of stock in the institution.' " *Id.* at 303. The Audubon folio thus was acquired by the Athenaeum, where it has nested until the events precipitating this lawsuit.

## Facts and Procedural History

The controversy that is the subject of plaintiffs' complaint takes flight from the actions of the board of directors in 2003 to deaccession the Audubon folio. Although a full recitation of the facts and proceedings before the Superior Court is not necessary to resolve the relatively narrow issue before us, it undoubtedly will be useful to provide some perspective on the nature of the dispute between the litigants. The following facts are distilled from the trial justice's written decision, to which the reader is referred for a more complete and thoughtful discussion. *Adams v. Providence Athenaeum,* 2004 WL 2075128 (R.I.Super. filed August 13, 2004).

For most of its sojourn at the Athenaeum, the Audubon folio has been housed in special drawers in its rare-books room. Some plates, however, "were on display at the Athenaeum where they could be and were viewed not only by Members but also by legions of students, children and other interested parties." Recently, in the mid–1990s, more than $100,000 was raised to do restoration work on the folio.

Also in the mid–1990s, the Athenaeum's endowment exceeded $6,000,000. As sure-

ly as the blue-headed vireo flies south for the winter, however, the stock market headed in the same direction, causing the board of directors to become concerned for the "economic viability of the institution." From 1998 to 2002, the annual operating budget increased from approximately $450,000 to slightly more than $900,000, requiring the board to draw from the endowment, thereby invading its principal. The percentage drawn from the endowment ran from 5.97 percent in 1998 to a high of 9.79 percent in 2002, in contravention of a spending policy that the board adopted in 1998 in an effort to contain distributions from the endowment within a range of 4 percent to 6 percent of a rolling three-year average. These recurring incursions, in conjunction with the declining stock market, caused the value of the endowment to fall to about $3,950,000 by July 2002.

Exacerbating these financial woes was "the need for substantial repairs to the Athenaeum's physical structure * * * [s]agging floors had made part of the building unsafe and required substantial expenditures to jack the floor up under the reading room." In response to these growing concerns, the board, in September 2002, conducted a "retreat where various alternatives or options were discussed," including "without limitation raising membership dues, cutting services, cutting staff positions, a [capital] campaign, merging with another institution, sale of the building and sale of the Birds of America." Eventually, the board voted to sell the Audubon folio, which recently had been appraised by Christie's as having a value between $5 million and $7 million, unless the endowment was raised to $10 million by April 30, 2003.

For more than ten years, Christie's had maintained a general business relationship with the Athenaeum. Its Rhode Island representative was a member of the Athenaeum, and it occasionally "performed gratis appraisals of various assets of the Athenaeum including in 1991 a $1.5 million dollar appraisal of the Birds of America Folio." Christie's was invited to make a presentation to the board immediately prior to its February 19, 2003 meeting, following which "the [b]oard unanimously authorized the signing of a contract with Christie's." The following day the library director sent a copy of the proposed consignment contract to a board member who was a partner in a large Providence-based law firm for her "informal" review. On or about February 24, 2003, a three-page communiqué entitled "Regarding the Providence Athenaeum's Finances and the Sale of the Audubon Folio" was sent to the membership. On March 2, 2003, at the annual meeting, "a minority of those present was vocal in their opposition to the auction sale contemplated by the consignment contract; however, a resolution approving of the sale was passed."

The plaintiffs filed this lawsuit on August 27, 2003, in an effort to block the sale by auction of the Audubon folio. In addition to their allegation that exclusive voting rights are vested by the charter in the "shareholders," and thus the provision in the current bylaws purporting to extend voting rights to all members is void, plaintiffs raised a covey of challenges to the actions of the board concerning its alleged breach of fiduciary duty and financial misfeasance in the management of the Athenaeum. They also asserted inequitable conduct by Christie's and its agents. As noted above, the trial justice rejected all plaintiffs' claims, concluding that "there can be no question but that the Board members acted 1.) in good faith; 2.) with the care an ordinary prudent person in a similar position would exercise under similar circumstances and 3.) in a manner he or she reasonably believed to be in the

best interest of the Athenaeum." This finding has not been challenged by any of the plaintiffs.

After the sole remaining plaintiff filed his appeal, defendants moved to dismiss the appeal for failure to order a trial transcript. This Court denied the motion, acknowledging that, in general, a pure question of law may be reviewed and decided without a full transcript. We did, however, advise plaintiff that "[t]he deliberate decision to prosecute an appeal without providing the Court with a transcript of the proceeding is risky business." We also directed plaintiff to provide "such portions of the transcript of the trial proceedings as bear upon the legal issue to be raised on appeal."

## Standard of Review

 Article I, Rule 10(b)(1) of the Supreme Court Rules of Appellate Procedure provides in pertinent part that:

> "Within twenty (20) days after filing the notice of appeal the appellant shall order from the reporter a transcript of such parts of the proceedings not already on file as the appellant deems necessary for inclusion in the record."

With respect to plaintiff's failure to order a transcript of the proceedings below we have held before that:

> "The deliberate decision to prosecute an appeal without providing the Court with a transcript of the proceedings in the trial court is risky business. Unless the appeal is limited to a challenge to rulings of law that appear sufficiently on the record and the party accepts the findings of the trial justice as correct, the appeal must fail." *731 Airport Associates, LP v. H & M Realty Associates, LLC,* 799 A.2d 279, 282 (R.I.2002) (citing

*DePetrillo v. Coffey,* 118 R.I. 519, 521 n. 1, 376 A.2d 317, 318 n. 1 (1977)).

Consequently, in this appeal, we are limited to reviewing challenges to rulings of law. The written decision of the trial justice sets forth the pertinent facts in sufficient detail, and we rely on his findings of fact in deciding this appeal. In addition, we are able to refer to the exhibits introduced at trial that were provided to us by the parties.[2] Therefore, we restrict our review to matters as they appear in these facts and documents, *see DePetrillo,* 118 R.I. at 521 n. 1, 376 A.2d at 318 n. 1; *Sormanti v. Deacutis,* 77 R.I. 507, 511, 77 A.2d 919, 922 (1951), and we rely on our fundamental principles of jurisprudence and established case law. When faced only with a question of law, this Court's review will be *de novo. Andrade v. Perry,* 863 A.2d 1272, 1274 (R.I.2004) (citing *Perry v. Garey,* 799 A.2d 1018, 1023 (R.I. 2002)).

## Discussion

The plaintiff frames the issue on appeal as a pure question of law, namely, whether "the [Providence] Athenaeum's Charter [was] violated by the abolition of the shareholders' Charter right to vote on all bylaw changes and to elect the Athenaeum's board of directors."

The resolution of this question requires us again to delve into the history of the Athenaeum, and review its charter and bylaws as they have evolved over the past 169 years. The Athenaeum was incorporated in 1836 by an act of the Rhode Island General Assembly. Its charter provides:

> "*Be it enacted by the General Assembly, and by the authority thereof it is enacted,* That Moses Brown, Nicholas Brown [and other named individuals],

---

**2.** Because the original trial exhibits are unavailable for review, the parties provided us with agreed-upon copies of the exhibits from the proceedings below.

together with each person who shall hereafter become a stockholder or proprietor in the same, their successors and assigns, be and they hereby are constituted and made a body corporate and politic, in the city of Providence, by the name and style of

### THE ATHENAEUM,

with perpetual succession; and by that name shall have power to have and use a common seal, and the same to break, alter and renew at pleasure; to prosecute and defend all suits in law or in equity; to have, hold, use and dispose of, at their pleasure, goods, chattels, lands and tenements, * * *. To make by-laws for the management of their concerns, and for the regulation of their library, * * *; *Provided* such by-laws be not repugnant to law. To elect all necessary officers, and prescribe the tenure of their offices and their duties; to hold meetings as often as occasion may require, ten to be a quorum, until other provisions be made on the subject by said corporation. To impose taxes on the owners of shares in said corporation; and generally to have and enjoy all the privileges and powers incident to corporations instituted for literary and scientific purposes.

"Sec. 2. *And be it further enacted,* That the share of each corporator shall be liable for all taxes assessed thereon, and may be sold for the payment thereof, under such terms, and in such manner as shall be prescribed in the by-laws.

"Sec. 3. *And be it further enacted,* That Zachariah Allen, be authorized to call the first meeting of said corporation, by giving public notice of the time and place of such meeting, in two of the newspapers printed in Providence, at least five days previous to the time appointed.

"Sec. 4. *And be it further enacted,* That this act of incorporation shall be subject to all future acts of the general assembly in amendment or repeal thereof, or in any wise affecting the same."

The Athenaeum's first bylaws, or "constitution," adopted on February 29, 1836, pursuant to the charter provided that

" 'any individual who shall pay into the treasury fifteen dollars, shall be a stockholder or proprietor, and entitled to one share of the joint stock of the corporation, which shall be transferable. And he shall be entitled to all the rights and privileges secured to stockholders, or proprietors, by the laws of the corporation, and subject to all the rules and regulations therein made and provided. The board of directors may admit annual subscribers to the privileges of the library, on such terms and conditions as they may from time to time prescribe.' " *The Providence Athenaeum v. Tripp,* 9 R.I. 559, 562 (1870).

These bylaws further provided that "each stockholder or proprietor 'shall be liable for all assessments voted by the corporation, provided the same do not exceed five dollars per annum on each share.' " *Id.*

As the trial justice found, "the corporate affairs of the Athenaeum continued uneventfully from the date of its incorporation for 138 years to April of 1974." [3] In

---

3. An uncontested amendment to the Athenaeum's charter in 1850 simply changed its name from "the Athenaeum" to "the Providence Athenaeum." 1850 R.I. Acts & Resolves p. 29. Two further uncontested amendments to its charter in 1925 and 1958 increased the amount of "goods, chattels, lands and tenements" the Athenaeum could "have, hold, use and dispose of at their pleasure" from the original amount of $100,000 to $300,000, 1925 R.I. Acts & Resolves p. 453, and further,

1974, the Athenaeum sought and was accorded status as a nonprofit organization exempt from federal income taxation, pursuant to § 501(c)(3) of the Internal Revenue Code. Contributions to § 501(c)(3) tax-exempt organizations provide donors with charitable contribution deductions. 1 Marilyn E. Phelan, *Nonprofit Enterprises: Corporations, Trusts and Associations* § 7:01 at 7–3 (2000). To meet the organizational test as a § 501(c)(3) organization, the Athenaeum's charter had to be amended to reflect that "no part of the net earnings of [the Athenaeum] inures to the benefit of any private shareholder or individual." I.R.C. § 501(c)(3) (West 2002). Therefore, the officers of the Providence Athenaeum certified that "at a legal meeting of said corporation, duly called for * * *, the following amendment(s) to the Articles of Association [were] duly adopted by the affirmative vote of a more than 2/3rds majority of a quorum of its members." The amendments provide in relevant part that:

> "Sec. 5. No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, its shareholders, Board of Directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of its purposes.

> "Sec. 6. Upon the dissolution of the corporation, the Board of Directors shall, after paying or making provision for the payment of all of the liabilities of the corporation, dispose of all of the assets thereof exclusively for charitable, educational, religious or scientific purposes * * *."

The plaintiff does not challenge that the Providence Athenaeum was indeed transformed into a tax-exempt nonprofit organization in 1974. He argues, however, that the charter amendment only eliminated the economic benefits of stock ownership; it did nothing to eviscerate or even have an impact on the exclusive voting rights of shareholders to elect officers and adopt bylaws.

It is clear that, until 1974, shareholders of the Providence Athenaeum had a financial interest in the corporation. With the Athenaeum's transformation into an I.R.C. § 501(c)(3) nonprofit corporation in 1974 and the adoption of the 1974 charter amendments, however, the shareholders agreed to relinquish their proprietary interest in the corporation.

Ten years later, the Athenaeum fell under the wing of the "Rhode Island Nonprofit Corporation Act," G.L. 1956 chapter 6 of title 7 (Nonprofit Corporation Act) enacted by the General Assembly in 1984. P.L. 1984, ch. 380, § 1. As seen above, the Athenaeum's charter provided in section 4 that "this act of incorporation shall be subject to all future acts of the general assembly in amendment or repeal thereof." In addition, the Nonprofit Corporation Act provides in § 7–6–3 that:

> "(a) The provisions of this chapter relating to domestic corporations apply to:
> " * * *

> "(3) All corporations previously or subsequently created by any special act of the general assembly for a purpose or purposes for which a corporation might be organized under this chapter * * *.

> "(b) The provisions of this chapter relating to the amendment of articles of incorporation of domestic corporations apply to all corporations previously or subsequently created by special act of the general assembly whose charters are subject to amendment, repeal, or modifi-

to $750,000, 1958 R.I. Acts & Resolves p. 1072.

cation at the pleasure of the general assembly."

■ The Nonprofit Corporation Act in § 7–6–2(8) defines "member" as "one having membership rights in a corporation in accordance with the provisions of its articles of incorporation or bylaws regardless of the name by which the person is designated." Pursuant to § 7–6–2(9) "no part of the income or profit [of the corporation] * * * is distributable to its members, directors, or officers * * *." In addition, although a corporation "may issue shares to its members, * * * no dividend shall be paid on the shares and no part of the income or profit of a corporation shall be distributed to its members, directors, or officers, * * *." Section 7–6–31.[4]

The Nonprofit Corporation Act, however, does not eliminate shareholders, nor does it void the granting of exclusive voting rights to shareholders. Section 7–6–31 expressly provides that nonprofit corporations "may issue shares to its members," and § 7–6–15 allows them to have "one or more classes of members."

### Bylaw Changes and Voting Rights

Two sets of bylaws that were introduced into evidence also inform our analysis.

The bylaws adopted in 1985 contain language in Article III entitled "Membership" that is strikingly similar to the 1836 "constitution":

"Any individual who shall pay into the treasury a subscription as may from time to time be specified by the Board of Directors shall be a shareholder entitled to one share of the joint stock of the Corporation * * *. Each shareholder shall be entitled to all the rights and privileges secured to shareholders by the laws of the Corporation and subject to all the rules and regulations made by the Board. * * * The number of shares outstanding at any one time shall not exceed one thousand and nine." [5]

Section 2 of Article III of the 1985 bylaws further provides that each shareholder "shall be furnished with a certificate of each share by him owned," and section 3 allows for the transfer of shares "upon authorization by the Board of Directors." Section 1 of Article III of the 1985 bylaws also provides that: "The Board of Directors may admit annual subscribers to the privileges of the library on such terms and conditions as it may * * * prescribe

**4.** In a business corporation, meaning a corporation "for profit," on the other hand, "shares" mean "the units into which the proprietary interests in a corporation are divided." G.L.1956 § 7–1.1–2(1),(4); *see also* 11 Fletcher, *Cyclopedia of the Law of Private Corporations,* § 5081 at 33 (West 2003). A "shareholder" in such a corporation then is someone "who is a holder of record of shares in a corporation." Section 7–1.1–2(6)(i). Generally, with regard to "for profit" corporations "shares" have been defined as

"the units into which the proprietary interests in a corporation are divided. Stock ownership represents a bundle of rights flowing from the corporation involving, inter alia, earnings, net assets, and voting power. Although ownership of shares confers no immediate title to any of the property of the corporation, it entitles the share-

holder to a fractional part of the property, or its proceeds, to the extent indicated, when distributed according to law and equity. Each share represents a distinct and undivided share or interest in the common property of the corporation." 18A Am. Jur. 2d *Corporations* § 356 at 229 (2004).

Consequently, one key distinction between nonprofit corporations and for-profit corporations is that in a nonprofit corporation shareholders/members do not have a proprietary interest in the corporation, as they do in a for-profit corporation.

**5.** The limit of outstanding shares to 1,009, according to the trial justice's decision, occurred at "an earlier time." The plaintiffs alleged in their complaint that the number of shareholders was fixed at 1,009 in 1920.

by its regulations or otherwise." In addition, Section 4 of Article III of the 1985 bylaws provides that "[c]ourtesy memberships may be offered to certain public officials and those providing special service to the library, at the discretion of the Director." This is also reflected in the four categories of membership listed in section 4:

"1. Shareholder, which includes members 'waiting for a share,' is entitled to full privileges of the library. Shareholder may be a single person, family, members of a household, an institution or an estate.

"2. Teacher/librarian membership is personal only. Full privileges, but does not include family members.

"3. Student membership is personal only. * * *

"4. Courtesy memberships in any category may be given on an annual basis by the Library Director."[6]

Voting rights, however, under section 3 of Article V of the 1985 bylaws, are limited to shareholders, which by definition include "members waiting for a share." *See* 1985 Bylaws, Article III, sec. 4(1). This limitation on the right to vote to "shareholders" is consistent with § 7–6–20(a) of the Nonprofit Corporation Act, which provides that: "The right of the members, or any class or classes of members, to vote may be limited, enlarged, or denied to the extent specified in the articles of incorporation or the bylaws."

The term "shareholder," however, disappears entirely from the bylaws adopted in

1997, the first bylaws challenged by plaintiff as "four square contrary to the Charter." Article III regarding membership provides:

## "MEMBERSHIP

"Section 1. *Members.* Any individual who shall pay into the treasury a subscription as may from time to time be specified by the Board of Directors shall be a member entitled to voting membership in The Providence Athenaeum, which shall be transferable. Each member shall be entitled to all the rights and privileges secured to members by the by-laws of the Corporation and subject to all the rules and regulations made by the Board. Courtesy memberships may be offered to certain public officials and those providing special service to the Athenaeum, at the discretion of the Library Director.

"* * * *

"Section 3. *Categories of Membership.* Categories of membership shall be designated by the Board, from time to time."

The plaintiff contends that the 1997 bylaws, as well as the ones adopted in 2000 under which the defendant officers and directors were elected, violate the charter's provision of exclusive voting rights to shareholders, and are thus void as a matter of law. It therefore follows, he posits, that the consignment contract with Christie's was executed by an unlawful board and is *ultra vires.*

---

**6.** For purposes of this appeal, it appears to us that the category of "members waiting for a share" is neither in conflict with the earlier bylaws nor those enacted after 1985 because none of the other bylaws available for our review limit the number of shareholders or members as do the 1985 bylaws. All that was required to become a shareholder/member, under all bylaws except those of 1985, was payment of the appropriate fee. The plaintiff, while not challenging the 1985 bylaws in their entirety, adds that the inclusion of shareholders-in-waiting may have violated shareholder rights, "albeit to a lesser degree than the 1997 bylaws."

Our analysis begins with the original charter enacted by the General Assembly in 1836. We have held that "by-laws are only a means of regulating the corporate powers, not of surrendering or suspending them." *Colaluca v. Societa Cooperativa Di Mutuo Soccorso Fratelli Bandiera*, 30 R.I. 304, 307, 75 A. 265, 266 (1910). The 1836 charter incorporated the named individuals "together with each person who shall hereafter become a stockholder or proprietor in the same, their successors and assigns." The charter further grants to such persons the power "[t]o make by-laws for the management of their concerns" and "[t]o elect all necessary officers." It is silent, however, as to the number of permissible "stockholders or proprietors," the means by which one may acquire stock in the corporation, or the manner in which such "powers" may be exercised.

The original bylaws, or "constitution," also adopted in 1836, stipulated that " 'any individual who shall pay into the treasury fifteen dollars, shall be a stockholder or proprietor, and entitled to one share of the joint stock of the corporation * * *.' " *Tripp*, 9 R.I. at 562. This provision has remained in effect in essentially the same language, unchallenged for over 160 years. The essential qualification of being a shareholder was the payment of money into the treasury. The charter does not require that any limitations be put on the number of individuals who may pay for the privilege of owning stock. At some point, the number of shareholders was restricted to 1,009, but this limitation always was subject to change, or elimination altogether. It is also clear that in 1974 stock ownership in the Athenaeum was divorced from any economic benefit that may have inured therefrom.

■ We finally consider two fundamental principles of corporate law. The bylaws of a corporation "have all the force of contracts as between the corporation and its members and as between the members themselves." 18A Am. Jur. 2d *Corporations* § 270 at 145 (2004). It is also well established that "[t]he bylaws of a corporation are presumed to be valid, and the courts will construe the bylaws in a manner consistent with the law rather than strike down the bylaws." *Frantz Manufacturing Co. v. EAC Industries*, 501 A.2d 401, 407 (Del.1985) (citing 8 Fletcher, *Cyclopedia of the Law of Private Corporations*, § 4184 (rev. perm. ed. 1982)).

In his decision the trial justice found as follows:

"No evidence was produced or offered by Plaintiffs with respect to any vote taken by the shareholders, the members or any other body with respect to any amendments to the Articles or to the adoption of any bylaw or bylaws. There is no evidence before the Court suggesting the impropriety of any bylaw provision as it formerly or now is found to exist. Clearly, Plaintiffs here had the burden of proof upon that issue. Argument alone does not suffice. The Court finds that there is a well-recognized presumption;

'that a corporation exercises its powers according to law, that its bylaws are valid, and that "the burden of overthrowing them is upon the party who asserts their invalidity.' " *Superior Bedding Co. v. Serta [Associates], Inc.*, 353 F.Supp. 1143[,] 1149 [(N.D.Ill.1972)]."

■ Our review of the record leads us to the same conclusion. Since the incorporation of the Athenaeum in 1836, voting rights in the corporation have been available to any individual willing to pay a fee into the treasury. Initially, the amount was fixed at $15; more recently it is designated as "a subscription as may from time to time be specified by the Board of Di-

784

rectors." In 1836, voting rights, as well as an economic interest in the assets of the Athenaeum were represented by shares of stock, "which shall be transferable." The charter amendments in 1974, however, divested these shares from any possible financial benefits, and in 1984, the Nonprofit Corporation Act defined "member" broadly enough to include within its ambit anyone possessing voting rights in a corporation. Originally the number of individuals entitled to voting rights was unrestricted; later it was limited to 1,009, then broadened in 1985 to include anyone "waiting for a share," and is now again unrestricted. Today voting rights in the Athenaeum are represented by "membership," which is also transferable "on the books of the Athenaeum."

The basic organizational structure of the Athenaeum appears to have remained consistent throughout its long and storied history. We accept the finding of the trial justice that no evidence was presented "suggesting the impropriety of any bylaw provision." Further, we deem this finding to be dispositive. When viewed through the prism of the 1974 charter amendments and the 1984 Nonprofit Corporation Act, neither the 1997 nor 2000 bylaws contravene the general powers granted in the original charter. Rather, they are presumed to be valid, *see Frantz Manufacturing Co.,* 501 A.2d at 407, and the plaintiff has failed to persuade us otherwise. Consequently, the plaintiff's challenge to the 1997 and 2000 bylaws on these grounds must fail, as does his appeal.

### Conclusion

For the foregoing reasons, we affirm the judgment of the Superior Court and remand the record in this case to the Superior Court.