### CITY OF BRADFORD

v.

### TEAMSTERS LOCAL UNION NO. 110, Appellant.

Commonwealth Court of Pennsylvania.

Argued Oct. 18, 2005.

Decided June 28, 2006.

Michael A. Palombo and Joseph S. Pass, Pittsburgh, for appellant.

Mark J. Hollenbeck, Bradford, for appellee.

BEFORE: LEADBETTER, Judge, LEAVITT, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge LEADBETTER.

Teamsters Local Union No. 110, on behalf of James Taylor, appeals from the order of the Court of Common Pleas of McKean County (common pleas), which vacated an arbitration award requiring Taylor's reinstatement, and affirmed the City of Bradford's (City) termination of Taylor. In this case we must determine whether the City, in fact, bargained away its ability to discharge an employee for conduct which interferes with its ability to perform a core municipal function and, if so, whether such an agreement exceeds the City's lawful power. For the reasons which follow, we affirm the order of the court of common pleas.

The arbitrator found the following facts. Taylor had been employed by the City for approximately two-and-one-half years when, on May 23, 2003, he noticed a purse in an open garbage bag while he was collecting garbage. When Taylor put the bag in the packer of the garbage truck, the bag spilled open and a large sum of money fell out of the purse. Although Taylor subsequently followed a co-worker's advice and gave the purse to a supervisor, he pocketed the money that he found with the purse. Taylor's supervisor contacted the local police and reported the discovery of the purse. A police officer determined that the purse had been reported stolen earlier that day and that at the time it was stolen it contained approximately $800.00. The purse only contained a few dollars when it was returned, however.

Taylor denied taking the money when he was first questioned by the police. Several hours after questioning, however, Taylor admitted that he had taken $239.00, which he then turned over to the police. On May 29, the City issued a disciplinary report, charging Taylor with violating Articles 13, 26 and 27 of the City's Standard Schedule of Disciplinary Offenses and Penalties;[1] this schedule was specifically referenced in the applicable Collective Bargaining Agreement (CBA). Taylor was given an indefinite suspension pending a hearing. Following a hearing, the City terminated Taylor on the ground that he violated the aforementioned articles.[2]

Taylor's termination was grieved, and, when the matter could not be resolved, arbitration followed. The CBA provided that the City "shall not discharge nor suspend any employee without just cause.... In respect to discharge or suspension, the [City's] 'Standard Schedule of Disciplinary Offenses and Penalties for City Employees' shall apply and the said schedule is specifically incorporated herein by reference...." CBA, Art. XV (Exhibit A to City's Petition to vacate arbitration award). Further, with respect to the arbitration of a grievance, the CBA provided

---

1. The City's Standard Schedule of Disciplinary Offenses is a non-exhaustive list of offenses and corresponding range of penalties. Specifically, the Schedule provides that, "[p]enalties for disciplinary offenses will, in general, fall within the range indicated. In unusual circumstances, depending on the gravity of the offense, the past record, and the position of the employee, a penalty outside of the general range may be imposed." R.R. at 45.

   Article 13 is the "[u]nauthorized possession of, loss of, or damage to City property or the property of others, or endangering same through carelessness." Id. at 46. Article 26 is the "[a]ctual or attempted theft of City property or the property of others." We note that the penalty for an article 26 violation ranges from reprimand to removal and that, "[w]hether or not restitution was made should enter into the determination of the penalty for the offense." Id. at 49. Finally, Article 27 is "[i]mmoral, indecent, or notoriously disgraceful conduct unbecoming a City employee." Id. at 47.

2. Apparently, Taylor was criminally charged with theft as well.

that the "findings of the arbitrators shall be binding on the parties." *Id.*, Art. XVII. The CBA further provided that the "arbitrators shall have no power to amend, modify, nullify, ignore or add to the provisions of [the CBA]. The arbitrators shall only consider and decide the particular issue or issues presented to them in the grievance and answer, and the decision of the arbitrators shall be based solely upon their interpretation of the meaning or application of the express language of [the CBA]." *Id.* Finally, the CBA noted that, "[t]he provisions of Section 2 of [the CBA] regarding rights of management are specifically excluded from arbitration, except actions of [the] City which constitute a breach of [the CBA]." *Id.* Section 2 provided that the Union "understands and agrees that the management officials of [the] City possess the sole right to operate the City government and services and that all management rights repose in [the] City."

The arbitrator was authorized to determine whether the City had just cause to terminate Taylor and, if the City lacked just cause, the arbitrator had the authority to determine the appropriate remedy. The arbitrator noted that, while the parties defined parameters as to what constitutes just cause, they did not negotiate and agree on "what exactly constitute[s] just cause in particular situations." Arbitration decision at 6, R.R. at 65. In addition, the arbitrator noted that the parties agreed to a disciplinary schedule, which provided a range of discipline for each offense. Based upon these factors, the arbitrator concluded that he had the authority to determine what constitutes just cause for termination as well as the reasonableness of the penalty imposed. The arbitrator then concluded that the charge that Taylor violated Article 26 (proscribing actual or attempted theft of property) was the only charge that accurately described Taylor's misconduct. The arbitrator found

that Taylor committed theft as charged. While the arbitrator conceded that theft is a serious offense that typically invokes severe disciplinary action, even warranting removal, he also found that:

> [T]he Parties in this matter have recognized that extenuating circumstances sometimes exist and that discharge is not always the appropriate response. In the Disciplinary Schedule incorporated into the [CBA], the Parties have agreed that the discipline to be imposed for a first-time violation of Article 26 can range from reprimand to removal. They also agreed "whether or not restitution was made should enter the determination of the penalty for the offense." With this negotiated language, the Parties have effectively agreed that theft, in and of itself, is not necessarily grounds for removal.

Arbitration decision at 7, R.R. at 66. Accordingly, the arbitrator concluded that mitigating circumstances such as restitution could be considered in determining the appropriate discipline. The arbitrator then noted that, when the City terminated Taylor, it failed to consider that Taylor had a good work history and had returned the money that he had taken. Based upon these mitigating circumstances, the arbitrator concluded that a long-term suspension was appropriate, converted the discharge into a suspension, and ordered Taylor reinstated without back pay or benefits. The City appealed to common pleas, seeking to vacate the award.

On appeal, common pleas took note that its review of the award was governed by the "essence test" as well as the principle that a "government employer cannot bargain away control over core powers essential to the proper discharge of the function for which the government entity is responsible." Common pleas opinion at 5 (citations omitted). Consequently, concluding

that garbage collection is a core function of the City and that the award, requiring reinstatement of an employee who engaged in serious misconduct, "strike[s] a fatal blow to the City's ability to manage one of its core functions," *id.* at 7, the court concluded that the award was not rationally derived from the CBA. Accordingly, common pleas vacated the award and reinstated Taylor's discharge. This appeal ensued.

Before addressing the particular arguments raised here, we note the law applicable to an appellate court's review of an arbitration award. As this court recently noted in *Philadelphia Housing Authority v. American Federation of State, County and Municipal Employees (Philadelphia Housing Authority)*, 900 A.2d 1043 (Pa. Cmwlth.2006):

> [O]ur Supreme Court has emphasized that arbitration of labor disputes is final and binding and is mandated by the Legislature, thereby requiring a court reviewing an arbitrator's award to accede "great deference" to it. The arbitrator's award is, therefore, final and binding unless the award does not draw its essence from the collective bargaining agreement. This exception is called the "essence test". . . .

*Id.* at 1046 [quoting *Southeastern Pa. Transp. Auth. v. Transport Workers Union of Am.*, 880 A.2d 731, 734 (Pa.Cmwlth. 2005) ]. We further opined in *Philadelphia Housing Authority* that:

> The essence test requires a two-part inquiry. First, the court must determine whether the issue, as defined,

comes within the terms of the CBA and, second, if it does, whether the award is rationally derived from the CBA. [*Southeastern Pa. Transp. Auth.*, 880 A.2d at 734]. See also *State Sys. of Higher Educ. (Cheyney Univ.) v. State Coll. Univ. Prof. Ass'n (PSEA–NEA)*, 560 Pa. 135, 743 A.2d 405 (1999). In addition, it is now well-established that "the usual degree of deference to be accorded an arbitrator's award is moderated in a situation in which the arbitrator's interpretation of the agreement led to the governmental employer relinquishing essential control over the public enterprise, i.e., those powers essential to its ability to discharge its functions." [3] *Greene County v. Distr. 2, United Mine Workers of Am.*, 578 Pa. 347, 361, 852 A.2d 299, 308 (2004). Both the Pennsylvania Supreme Court and this court have held that a government employer cannot bargain away its power to fire for misconduct bearing directly upon the performance of its public function; this incapacity imposes a legal restriction on an arbitrator's interpretation as to what the parties meant by "just cause." *See, e.g., Office of Attorney Gen. v. Council 13, American Fed'n of State, County Mun. Employees (OAG)*, 577 Pa. 257, 844 A.2d 1217 (2004); *City of Pittsburgh v. Pittsburgh Joint Collective Bargaining Comm.*, 852 A.2d 452 (Pa.Cmwlth. 2004).

*Philadelphia Housing Auth.*, 900 A.2d at 1046 (footnote added).

In this appeal, the dispute arises under the second prong of the essence test, as

---

**3.** This principle is rooted in a number of Supreme Court decisions that culminate with *Greene County v. District 2, United Mine Workers of America*, 578 Pa. 347, 852 A.2d 299 (2004). *See Office of Attorney General v. Council 13, Am. Fed'n of State, County Mun. Employees (OAG)*, 577 Pa. 257, 844 A.2d 1217 (2004); *City of Easton v. Am. Fed'n of State,* *County & Mun. Employees*, 562 Pa. 438, 756 A.2d 1107 (2000); *Pa. Liquor Control Bd. v. Indep. State Stores Union (ISSU)*, 520 Pa. 266, 553 A.2d 948 (1989); *County of Centre v. Musser*, 519 Pa. 380, 548 A.2d 1194 (1988); *Phila. Hous. Auth. v. Union of Security Officers*, 500 Pa. 213, 455 A.2d 625 (1983).

there is no question that the issue of whether Taylor's misconduct constitutes just cause for discharge is arbitrable under the terms of the CBA. Moreover, it is beyond reasonable dispute that the misconduct found here bears directly upon the City's performance of its public function. As common pleas cogently explained:

I presume it should be patently obvious why once the Arbitrator concluded Taylor engaged in "serious misconduct" by stealing from a city resident while he was on duty, preventing the city from discharging him would seriously interfere with the City's ability to perform a core municipal function. Because the City collects garbage as a public function and prohibits private garbage collection, it bears a special burden to protect its citizens against criminal acts by its employees who perform that function. To inhibit the City's ability to assure the integrity of its workforce through the sanction of discharge, and thereby subject its citizens to criminality, obviously impairs the City's ability to effectively provide a governmental service since its ability to assure taxpayers that governmental functions are being honestly performed has been compromised.

Every citizen has a right to expect he or she will be honestly served by those who perform functions supported by that citizen's tax dollars. And each citizen has a right to expect those who manage the public's business will assure publicly supported functions do not present an opportunity for public employees to substitute service with theft. . . .

Public trust in government is premised, at least in part, on the honesty of the public's employees. The inability to sanction dishonest public employees with discharge undermines the public's trust. No municipality has the power to bargain away the public's expectation in the honesty of its employees.

Common pleas' op. at 2 (No. 815 CD 2004, filed April 12, 2005) (footnote omitted). Moreover, in *Pennsylvania Liquor Control Board v. Independent State Stores Union (ISSU)*, 520 Pa. 266, 553 A.2d 948 (1989), and *City of Easton v. American Federation of State, County and Municipal Employees, AFL–CIO*, 562 Pa. 438, 756 A.2d 1107 (2000), our Supreme Court has clearly stated that a CBA cannot be interpreted in a manner that results in the public employer's relinquishing its power to terminate a thief.

In *ISSU*, a general manager for the Pennsylvania Liquor Control Board (LCB) misappropriated funds and falsified business records. The CBA in that case provided that the employer could not take any disciplinary action against a manager without just cause. In addition, the employer's work rules set forth a class of offenses that could provide just cause for immediate dismissal, including the theft of Commonwealth property. In vacating the arbitration award reinstating the discharged manager, our Supreme Court opined:

[T]he LCB, pursuant to its distributional function, has responsibility for enormous inventories of merchandise and vast amounts of money resulting from sales. It is equally obvious that the LCB, given its legal responsibilities, must be able to maintain honesty and integrity on the part of its employees who have ready access to its wares and revenues. To that end, the power of the LCB to discharge any employee who is proven to have stolen property from the agency is one of unquestionable importance and presumptively retained by management. *We find nothing in the labor agreement here involved or any circumstance to suggest that the LCB had "bargained away" its power to discharge a proven*

thief; and it would be "manifestly unreasonable" to conclude that the agency intended to do so. In this connection, it should be recognized that a governmental agency does not have the freedom of a private enterprise to relinquish powers inherently essential to the proper discharge of its function.

520 Pa. at 277–78, 553 A.2d at 953–54 (footnotes omitted, emphasis added).[4]

In *City of Easton,* our Supreme Court vacated an arbitration award that reinstated an employee who had been terminated by the City for holding a second job with another employer and submitting time sheets to both employers to collect double pay for hours actually worked for only one of the employers. The parties' CBA in that case provided that an employee could be immediately dismissed for willful misconduct or neglect of duty, which resulted in significant adverse consequences to the City. The Supreme Court noted that, in interpreting the term "willful misconduct" in the CBA, the arbitrator failed to take into account that the City "did not and *could not* relinquish those powers which were essential to its ability to properly discharge its various functions, including the power to terminate those employees who steal from the City itself, or steal from others while working for the City." 562 Pa. at 447, 756 A.2d at 1111 (emphasis added). The court further noted that the fact that it was unclear which employer had been the victim of the theft did not command a different result, noting that it failed "to see how any government agency could ensure proper discharge of its official functions if it lacked the power to discharge employees" who committed a theft against the government employer or a third party while they were working for

the government agency. *Id.* at 449 n. 6, 756 A.2d at 1113 n. 6. It should be noted, however, that, in reaching the conclusion that the award was not rationally derived from the CBA, the court also observed, as it did in *ISSU,* that there was no evidence indicating that the City intended to relinquish its right to terminate employees who committed willful misconduct on the job.

However, in both *ISSU* and *City of Easton,* the court noted that nothing in the CBAs suggested that the public employer "had 'bargained away' its power to discharge a proven thief; and it would be 'manifestly unreasonable' to conclude that the agency intended to do so." *See, e.g., ISSU,* 520 Pa. at 277, 553 A.2d at 954. In this case there is an indication that the City intended to bargain away its right to terminate an employee for theft in some cases, and it is upon that provision that the Union relies. Emphasizing that the CBA did not require termination for theft in all instances, and provided for consideration of mitigating circumstances such as restitution in determining the appropriate penalty, the Union argues that the arbitrator simply enforced a contract provision to which the City specifically agreed. Therefore, the Union contends that the City cannot now seek to set aside the award on the ground that the provision is unlawful, or that it interferes with its power to discharge its core functions.

■ Initially, we note our disagreement with the assertion that the City did, in fact, bargain away its right to discharge an employee under the present circumstances. That assertion is based upon the false premise that all theft offenses are the same for these purposes, when plainly they are not. Thus, in *City of Pittsburgh v.*

---

4. We note that the "manifestly unreasonable" standard is no longer appropriate. *See State Sys. of Higher Educ. (Cheyney Univ.) v. State*

*Coll. Univ. Prof'l Ass'n (PSEA–NEA),* 560 Pa. 135, 743 A.2d 405 (1999).

*Pittsburgh Joint Collective Bargaining Committee,*[5] we found that the City's essential functions were not impacted by an employee's off-duty [6] theft of DVDs from a store, while the opposite conclusion was reached concerning the work-related thefts in *ISSU* and *City of Easton.* In *City of Pittsburgh* we noted:

> [The employee's] misconduct in the present case falls outside of the type of conduct ... as that bearing upon the governmental employer's discharge of its public functions. [The employee] did not commit a crime directly against his employer ... or a third party while working.... Equally important, his theft did not impact a third party whom his employer, the City Department of Public Works, was charged with protecting, nor did it otherwise impair the city's ability to perform any part of its essential function. Therefore, the City was not precluded from bargaining with respect to whether that misconduct constituted just cause to terminate employment, and the arbitrator was at liberty to construe the "just cause" provision of the [collective bargaining agreement] in light of the many factors generally recognized as relevant indicia of contract intent.

852 A.2d at 458 (footnote and citations omitted). Accordingly, we do not agree that by negotiating for a range of discipline for theft offenses generally, the City has explicitly bargained away its right to terminate an employee for those categories of theft which adversely impact the City's ability to perform its public function. Since it is clear that the conduct in this case falls into that category, we believe that common pleas properly applied the core function test in vacating the arbitration award.[7]

Even were we to accept the arbitrator's determination that the City had expressly agreed to a range of penalties for any and all theft offenses, we would still conclude that the core function limitation applies to the arbitration of this matter. In support of its argument to the contrary, the Union relies on several Supreme Court decisions which hold that an employer cannot agree to a contract provision in the bargaining process and then later refuse to abide by such on the basis of contractual incapacity. *See generally Borough of Ellwood City v. Ellwood City Police Dep't Wage & Policy Unit,* 573 Pa. 353, 825 A.2d 617 (2003); *Pittsburgh Joint Collective Bargaining Comm. v. City of Pittsburgh,* 481 Pa. 66, 391 A.2d 1318 (1978). *See also Grottenthaler v. Pa. State Police,* 488 Pa. 19, 410 A.2d 806 (1980). We find these cases inapposite to the case at hand.

In *Pittsburgh Joint Bargaining Committee,* the City of Pittsburgh entered into a CBA agreeing to arbitrate grievances arising under the CBA. The City subsequently discharged an employee and then refused to arbitrate the matter on the grounds that the discharge was not an arbitrable issue since it belonged before the Civil Service Commission. In concluding that the chancellor had erred in deciding that the matter was not arbitrable, our Supreme Court examined the strong policies favoring arbitration. The court opined in relevant part:

> In the instant case the challenge is directed to the capacity of the employer to submit this particular subject to arbitration.... The relationship between

---

**5.** 852 A.2d 452 (Pa.Cmwlth.2004).

**6.** Although the theft occurred during work hours, the grievant had left work to engage in personal errands.

**7.** *See Philadelphia Housing Auth. v. Am. Fed'n of State, County & Mun. Employees,* 900 A.2d 1043, 1058–59 (Pa.Cmwlth.).

the public employer and the designated bargaining unit is one which must be sustained for years, during which a number of contract negotiations will occur. To sustain a harmonious relationship it is necessary for each of the parties to be pliable and willing to recognize the other's position. Nothing could be more disruptive to such a relationship than a demonstration of bad faith bargaining on the part of one of the parties.

We have already stressed the importance of grievance arbitration in facilitating the development and maintenance of harmonious relationships between the public employer and employee. It is even more supportive of a favorable employment climate where this dispute resolution mechanism arises from the good faith bargaining of the parties rather than being required by statute. To permit an employer to enter into agreements and include terms such as grievance arbitration which raise the expectations of those concerned, and then to subsequently refuse to abide by those provisions on the basis of its lack of capacity would invite discord and distrust and create an atmosphere wherein a harmonious relationship would virtually be impossible to maintain.

Good faith bargaining would require that questions as to the legality of the proposed terms of a[CBA] should be resolved by the parties to the agreement at the bargaining stage.

481 Pa. at 74–75, 391 A.2d at 1322–23 (footnote omitted).

Subsequently, in *Grottenthaler*, the CBA provided for survivor's benefits at a time when Section 5955 of the State Retirement Code, 71 Pa.C.S. § 5955, removed pension rights from the bargaining table. Specifically, Section 5955 provided that, "[p]ension rights of State employees shall be determined solely by this part or any amendment thereto, and no [CBA] between the Commonwealth and its employees shall be construed to change any of the provisions herein." 488 Pa. at 22, 410 A.2d at 807 (quoting Section 5955). This court concluded that Section 5955 barred a claim for survivor's benefits under the applicable CBA. Relying on *Pittsburgh Joint Bargaining Committee*, the Supreme Court disagreed, stating:

Here the employer is the Commonwealth. The prohibition set forth in Section 5955 is not constitutionally mandated by either the state or federal constitutions. Section 5955 merely represents an exercise of legislative judgment. To permit the Commonwealth to ignore its mandate with impunity in two successive bargaining contracts following the promulgation of Section 5955, and then to assert it as a bar to a claim for recovery under the [CBA] would be manifestly unfair. The demoralizing effect of such a result on the relationship between employer and employee in the public sector is readily apparent. We are, therefore, compelled to conclude that the inclusion of these benefits in the [CBAs] following the passage of Section 5955 constituted an express waiver of any bar Section 5955 may otherwise have posed....

488 Pa. at 26, 410 A.2d at 809 (footnotes omitted).

A different result was reached in *Borough of Ellwood City*. There, the Borough commenced employee payroll deductions as contributions to the police pension plan after an actuarial report indicated that the plan could not meet annual obligations. The Union filed a grievance, asserting that the contributions violated the applicable CBA, which precluded employee contributions absent a determination that the plan was actuarially unsound. The Union contended that the actuarial soundness of the

plan was governed by criteria set forth in a prior grievance arbitration award. The Borough contended, on the other hand, that determination of actuarial soundness was governed by statute, including Act 205,[8] which provided that its provisions applied notwithstanding an agreement to the contrary. The arbitrator adopted the Union's position, thereby concluding that the members could not be required to contribute to the pension plan in the circumstances presented.

Distinguishing the line of cases that held that a party cannot object to the legality of a provision to which it voluntarily agreed during the bargaining process, this court concluded that Act 205 expressly limited the employer's authority to bargain and that the award was inconsistent with the applicable statutory framework. Therefore, we reversed common pleas and vacated the award. On appeal, the Supreme Court affirmed. Although it reaffirmed the well-established principle that policies favoring labor arbitration are of sufficient magnitude that the courts in some instances have authority to enforce a CBA containing a provision that is not in accordance with the law, it declined to enforce the CBA before it, stating:

> In none of these decisions, however, was Act 205's directive that its provisions apply notwithstanding contrary provisions of law or agreement, see 53 P.S. § 895.301(a), at issue. This prescription, in contrast to those at issue in [the other cases discussed, including *Pittsburgh Joint Collective Bargaining Committee* ], does not merely prohibit the making of a contrary agreement or one that exceeds permissible subject-matter scope of bargaining. Rather, Act 205 requires that, in the event of an actual conflict between the statute and a[CBA], the statute must be given effect; indeed, relief in mandamus is expressly authorized to this end. *See* 53 P.S. § 895.306(b).

> . . . .

> Thus, although we are cognizant of the emphasis given to the sanctity of the bargaining process in the *Pittsburgh Joint Collective Bargaining Comm[ittee]* line of cases, in this instance, we conclude that the Legislature's express decision to subordinate such policy to the consistent application of minimum funding standards for municipal pension plans manifested in Act 205, directed to pernicious consequences of under-funding, should be respected.

573 Pa. at 362–63, 825 A.2d at 622–23 (footnotes and citations omitted).

After careful consideration of *Pittsburgh Joint Collective Bargaining Committee,* and its progeny,[9] and the policies discussed therein, we conclude that those cases cannot be extended to support the conclusion that a public employer is free to bargain away a right that impedes its ability to either protect or serve its citizens. Those decisions clearly do not involve public employers that had bargained away any aspect of their authority that restricted their ability to insure the health, safety and welfare of their citizens or the performance of their public functions. Rather, those cases generally involved public employers who made concessions at the bargaining table involving employee benefits and remedies that were not otherwise required by statute.[10] Therefore, in those

---

8. Act of December 18, 1984, P.L. 1005, *as amended,* 53 P.S. §§ 895.101–895.803.

9. *See also Fraternal Order of Police v. Hickey,* 499 Pa. 194, 452 A.2d 1005 (1982).

10. Such subjects are typically the subject of collective bargaining. *See* Sections 701 and 702 of the Public Employe Relations Act, Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. §§ 1101.701, 1101.702.

circumstances, the courts refused to allow the employer to subsequently renege on a promise made during bargaining under the guise of illegality or lack of contractual capacity.

■ However, neither the parties' research, nor our own, has led to any decisional law wherein a public employer, with subsequent judicial sanction, expressly bargained away a right that was critical to the performance of its public duties and responsibilities. Today, we expressly conclude that the public employer cannot bargain away such rights. As the Supreme Court stated in *City of Easton,* a public employer "[can] not relinquish those powers which [are] essential to its ability to properly discharge its various functions, including the power to terminate those employees who steal from the [employer] itself, or steal from others while working for the [employer]." 562 Pa. at 447, 756 A.2d at 1111.

■ In *Greene County v. District 2, United Mine Workers of America,* 578 Pa. 347, 852 A.2d 299 (2004), the Supreme Court recognized the important responsibility of public employers:

Unlike private sector employers, public employers are ultimately responsible for the health, safety, and welfare of our communities. Due to their unique nature and role, public employers must be able to perform the functions they are charged to carry out by our citizenry. Consistent with this status, our Court has recognized that public employers cannot be compelled in arbitration to relinquish powers that are essential to the proper discharge of their functions.

*Id.* at 362, 852 A.2d at 308 (citation omitted). To allow a public employer to relinquish those fundamental rights, which go to the very heart of its ability to protect and serve the public, places the public at risk from a variety of harms, ranging from inadequate public service to the risks associated with dishonest or predatory employees. As common pleas aptly noted:

To inhibit the City's ability to assure the integrity of its workforce through the sanction of discharge, and thereby subject its citizens to criminality, obviously impairs the City's ability to effectively provide a governmental service since its ability to assure taxpayers that governmental functions are being honestly performed has been compromised.

Every citizen has a right to expect he or she will be honestly served by those who perform functions supported by that citizen's tax dollars. And each citizen has a right to expect those who manage the public's business will assure publicly supported functions do not present an opportunity for public employees to substitute service for theft. . . .

Public trust in government is premised, at least in part, on the honesty of the public's employees. The inability to sanction dishonest public employees with discharge undermines the public's trust.

Common pleas' op. at 2 (footnote omitted). Therefore, we conclude that a public employer does not have the authority to expressly bargain away its ability to terminate an employee whose conduct hampers the employer's performance of its duties or its ability to insure the health, safety and welfare of its citizens, and any such provision in a CBA cannot be given effect.

Accordingly, we affirm the order of the court of common pleas.

### *ORDER*

AND NOW, this 28th day of June, 2006, the order of the Court of Common Pleas of

McKean County in the above-captioned case hereby is AFFIRMED.