February 17, 2020

**Supreme Court**

No. 2017-423-Appeal.
No. 2018-107-Appeal.
No. 2018-111-Appeal.
(PC 08-4992)

NESC, Inc. d/b/a New England Specialty     :
              Concrete

           v.                 :

Bacon Construction Co., Inc., et al.     :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

**Supreme Court**

No. 2017-423-Appeal.
No. 2018-107-Appeal.
No. 2018-111-Appeal.
(PC 08-4992)

NESC, Inc. d/b/a New England Specialty   :
Concrete

v.   :

Bacon Construction Co., Inc., et al.   :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Robinson, for the Court.** These consolidated cases come before the Supreme Court pursuant to a judgment on a jury verdict entered on November 3, 2017 in favor of the plaintiff, NESC, Inc. (NESC). The defendant, Bacon Construction Co., Inc. (Bacon), appeals from a judgment entered pursuant to Rule 54(b) of the Superior Court Rules of Civil Procedure relating to a January 3, 2018 order denying its motion for a new trial or, in the alternative, a remittitur. NESC cross-appeals from a September 2, 2014 order denying its "Motion for Leave to File First Amended Complaint" (motion to amend) and a November 4, 2016 order denying its motion to reconsider the denial of its motion to amend.

For the reasons set forth in this opinion, we affirm the judgment and the orders of the Superior Court.

# I

## Facts and Travel

This case arises from a dispute between a general contractor, Bacon, and a subcontractor, NESC, regarding an agreement to install flooring in a dormitory on the campus of Rhode Island College (RIC). On July 30, 2008, NESC filed a complaint in Superior Court against both Bacon and CNA Surety Corporation[1] alleging as to each defendant: (1) breach of contract; (2) unjust enrichment; (3) violation of the Rhode Island Prompt Payment Act; and (4) insurer bad faith. The factual allegations underlying all four claims were to the effect that NESC had not been fully compensated for the work which it had performed as a subcontractor on the RIC project. In response, Bacon filed a counterclaim against NESC, alleging breach of contract and negligence.

## A

### NESC's Motion to Amend

On March 25, 2010, NESC filed, under seal, a proposed amended complaint seeking to add a claim against Bacon under the Rhode Island False Claims Act, G.L. 1956 § 9-1.1-3. NESC also provided a written copy of the amended complaint to the Rhode Island Department of the Attorney General in accordance with § 9-1.1-4(b)(2). On December 3, 2013, the Attorney General filed in the Superior Court a "Notice of Election to Decline Intervention." On August 4, 2014, NESC filed a motion to amend its complaint. On September 2, 2014, following a hearing on August 27 of that year, an order entered denying NESC's motion to amend. Some two years later, on September 9, 2016, NESC filed a motion to reconsider the previous denial of its motion to amend. On November

---

[1] According to NESC's complaint, CNA Surety Corporation issued a bond to Bacon to insure Bacon's performance on the general contract.

4, 2016, following a hearing on October 27 of that year, an order entered denying NESC's motion to reconsider.

## B

## The Trial

Prior to trial, the parties stipulated to a contract price of $10.69 per square foot for the complete flooring system.[2]  The parties also stipulated as follows:

> "that NESC's claimed contact [*sic*] amount owed is $125,733.67 (which claim Bacon disputes).  (The amount of NESC's claim is based on its claimed contract price of $949,272 (88,800 square foot. x $10.69 per square foot) minus payments previously made by Bacon of $784,538.33 minus the above-mentioned credit of $39,000)."[3]

The case opened to the jury on October 30, 2017 and was heard over four days.  The jury heard testimony from six witnesses.  We summarize below the relevant evidence presented at trial.

## 1

## The Testimony of Anthony Petronio

NESC called Anthony Petronio as its first witness.  He testified that he began working for NESC in 2002 and assumed the position of general manager in 2006.  He stated that, as general manager, part of his job duties included finding work, obtaining drawings for presentation to estimators, and negotiating contracts.  He also testified that he had authority to enter into contracts

---

[2]     The $10.69 per square foot figure has remained a "fixed star" throughout the lengthy travel of this case.

[3]     The stipulation provided that "NESC will credit Bacon the amount of $39,000.00 towards the contract price in exchange for Bacon's waiver of claims for credits for workmanship, floor defects, and any change orders * * *, or credits for early payment * * *."  This aspect of the stipulation has no direct bearing on these appeals.

- 3 -

on behalf of his employer. He further testified that, in 2006, NESC distributed Maxxon products, which are gypsum-based flooring products.

Mr. Petronio also testified that Bacon asked NESC to submit a bid to install flooring at the RIC project and that it provided NESC with the contract drawings. He testified that Robinson Green Beretta, the architectural firm on the project, was seeking the installation of a specific type of acoustic Maxxon flooring composed of two products: (1) Dura-Cap, a type of base layer; and (2) WearTop, a type of finished flooring. Mr. Petronio also testified that, when Bacon first provided NESC with the bid documents, it was NESC's understanding that the project was to be completed by the Spring of 2007, in anticipation of the dormitory opening for students in the Fall semester. He stated that NESC submitted its first bid to Bacon in January of 2006 based on an estimate that 92,000 square feet of flooring would be needed; he added that Bacon did not accept that first bid. Mr. Petronio further testified that Bacon later asked NESC to submit a revised bid based on 91,430 square feet, and that NESC did so on July 26, 2006. He stated that Bacon did not accept the revised bid either.

It was further Mr. Petronio's testimony that, on April 10, 2007, NESC sent a fax to Bacon addressed to Rick Reuter, an employee of Bacon,[4] which fax consisted of yet another bid and a fax cover sheet stating that "it looks like the only variable at this point is an agreed to square footage." The fax containing the new bid and the cover sheet was admitted as an exhibit at trial. The just-referenced bid included a range of square footage for both Dura-Cap and WearTop. According to Mr. Petronio, the high and low points of the range of square footage were derived from Bacon's estimate of 88,800 square feet and NESC's estimate of 96,329 square feet. Mr. Petronio also testified that, on the same date, he had a discussion with Mr. Reuter, in the course of which

---

[4]     Rick Reuter's role is discussed more fully in Part I.B.2, *infra*.

discussion they agreed that, in order to resolve the difference in the square footage estimates, "[they] could get a third party to digitize the plans" and that "Mr. Reuter agree[d] to submit the plans to Civil Takeoffs[5] * * *."

Mr. Petronio next testified that, after making an adjustment at Bacon's request concerning an item that is not material to the instant dispute, he faxed NESC's final bid to Bacon on April 11, 2007 and included therein the same range of square footage as he had included in the previous bid. He testified that Bacon accepted this bid and proceeded to generate a contract. Mr. Petronio testified that he received the proposed contract from Bacon on April 16, 2007. He further testified that the proposed contract included the same range of square footage as was set forth in NESC's final bid. Mr. Petronio stated that, after Wayne Capolupo (the owner of NESC) signed the contract without making any alterations to the range of square footage, the contract was faxed back to Bacon on April 18, 2007. According to Mr. Petronio's testimony, when NESC signed the contract, it was not "prepared to do the job and perform the work on the contract on a square footage less than 88,800 square feet[.]" He testified that, one day after returning the signed contract to Bacon, employees of NESC arrived on the job site and started working.

Mr. Petronio then testified that, on May 3, 2007, he received a fax from Mr. Reuter with a cover sheet that stated: "Here is a copy of your signed subcontract agreement. Please note the few markups made. Call with any questions." He went on to describe a note which appeared to him to have been written by Michael Bahry, the vice president of operations for Bacon, and which stated: "Actual price will be determined by actual quantity supplied by Civil Takeoffs, LLC, attached." Mr. Petronio testified that this note was added by Bacon. He further testified that the

---

5       According to Mr. Petronio's testimony, Civil Takeoffs is a third-party company that had previously performed work digitizing plans.

figure of 88,800 square feet used in the contract was crossed out and replaced with the number 83,318. Mr. Petronio acknowledged that 83,318 was the amount of square footage determined by Civil Takeoffs.

It was Mr. Petronio's testimony that, after receiving the May 3, 2007 fax, he immediately called Mr. Reuter and "told him [he] didn't think the number was correct." He added that he had told Mr. Reuter that he "couldn't do it for the eighty-[three[6]] three" because he "would end up losing money doing it." He then testified that Mr. Reuter said "what if we do an as-built[?] At the end of the job, we will measure up the rooms." Mr. Petronio stated that he rejected Mr. Reuter's suggestion, but said "what I will agree to is your original number of 88,800 square feet." He then testified that Mr. Reuter agreed to use the 88,800 square feet number. According to Mr. Petronio's testimony, Mr. Reuter did not qualify his agreement to using that number by saying that he needed to obtain permission from either George Agostini, the owner of Bacon, or Michael Bahry, the purchasing agent for Bacon. Mr. Petronio further testified that, immediately after his phone conversation with Mr. Reuter, he wrote on the fax cover sheet "Called Rick. Agreed to use Bacon number 88,800 square feet." He also testified that he had believed that Mr. Reuter had authority as executive manager of Bacon to make that agreement.

Mr. Petronio testified that, following this agreement, there were no further written agreements exchanged between the parties. He stated that NESC continued working on the project after the May 3, 2007 conversation and that NESC completed the project by the end of July 2007. Mr. Petronio further testified that NESC made three payment applications to Bacon, each

---

[6] Although the transcript of Mr. Petronio's testimony indicates that he said he "couldn't do it for the eighty-eight three," it is clear from the context that he was actually referring to the 83,318 square feet figure.

- 6 -

application being based on the 88,800 square footage figure.  He stated that Bacon paid the first two payment applications in full, but that the final payment application was not paid.

## 2

### The Testimony of Richard Reuter

Next, NESC called Richard Reuter as an adverse witness.  Mr. Reuter testified that he had been an employee of Bacon since 1994.  He testified that Bacon is owned by George Agostini and is a general contractor "involved in the business of constructing schools and facilities for universities * * *."  Mr. Reuter also testified that he was employed as an executive manager at Bacon when Bacon was engaged in the bidding process for subcontracts for the project at RIC.  He stated that, as executive manager, he had authority to sign contracts.  He further testified that Bacon and NESC negotiated from approximately January of 2006 until April of 2007 regarding a subcontract to install a Maxxon acoustical flooring system, but that he did not become personally involved until the Spring of 2007.  Mr. Reuter stated that, at the time when he became involved with the project, Michael Bahry was handling purchasing.  He also admitted that Bacon was "getting pressure to get [the] flooring contract designed * * *."

Mr. Reuter further testified that Mr. Bahry had drafted the contract that Bacon faxed to NESC on April 16, 2007, which contract specified a range of square footage between 88,800 and 96,329.  He testified that Bacon received a fax of the contract signed by Mr. Capolupo on April 18, 2007.  Mr. Reuter testified that, while he was not aware that the parties had agreed to use a third party to determine the actual square footage, "[his] understanding [wa]s that [the parties] put that range in the contract to get work to proceed, knowing there wasn't an agreement, and that the two companies would come to an agreement on the square footage at some point."  He also testified

that, "at the time the contract was sent out," his understanding "was that at a minimum, based on that arrangement, the square footage was going to be 88,800 square feet * * *."

It was also Mr. Reuter's testimony that, after Civil Takeoffs sent its report to Bacon, Bacon revised the contract. He stated that Mr. Bahry marked up the contract, crossed out the 88,800 square feet figure, and replaced it with 83,318 square feet—the number arrived at by Civil Takeoffs. Mr. Reuter testified that he signed the revised contract and faxed it to Mr. Petronio on May 3, 2007. According to Mr. Reuter's testimony, Mr. Petronio called him after receiving the fax and expressed his disagreement with Bacon's changes. Mr. Reuter admitted that, during this phone conversation, he asked Mr. Petronio if he would accept 88,800 as the final quantity of square footage, and Mr. Petronio agreed. Mr. Reuter then clarified his testimony, stating that, "as a company," he never agreed to use 88,800 as a final number, but that he had personally agreed to do so. He testified that he was agreeable to going forward with the 88,800 figure, but he added that "[he] said [he] would have to go to George Agostini and Michael Bahry to confirm that."

According to Mr. Reuter's testimony, he spoke with Mr. Agostini and Mr. Bahry about using 88,800 square feet, and they did not accept that figure. He further testified that he then "informed Tony [Petronio] that the agreement for eight eighty-eight that [he] had between him [*sic*] was not good." Mr. Reuter then stated that, "[a]s far as requisition, we still used eight eighty-eight, I believe." He also testified that the parties "had talked about doing the joint survey between the companies," but he admitted that "there was no agreement on that actual final survey * * *."

When asked about when Bacon performed an as-built survey to determine the square footage of the Maxxon flooring actually installed, Mr. Reuter testified that it was not performed until a few months prior to the date of his testimony at trial in October of 2017. Mr. Reuter also

testified that, in December of 2007, several months after NESC completed the flooring project, Bacon submitted a change order to RIC requesting a credit based on a figure of 88,000 square feet.

**3**

**The Testimony of George Agostini**

Bacon presented four witnesses at trial. First to testify on Bacon's behalf was George Agostini, who testified that he had been the president of Bacon since 1984. Mr. Agostini testified that Bacon signed the general contract with RIC in February of 2006. He testified that RIC and the architect on the project wanted to use the Dura-Cap flooring product, but that Bacon did not want to do so. He further testified that the subcontract with NESC was signed in April of 2007, but he stated that he was not involved in the conversations leading up to that agreement.

It was further Mr. Agostini's testimony regarding Mr. Reuter's role that "[o]ur project managers do not negotiate contracts" and that contract negotiating was the responsibility of Mr. Bahry, as vice president. He stated that project managers "were given the power to be able to sign [contracts]. But it was with approval from Michael Bahry." Mr. Agostini testified that he and Mr. Bahry discussed the markups Mr. Bahry had made to the agreement signed by NESC, specifically using the 83,318 square footage figure from Civil Takeoffs. When asked if Mr. Bahry and/or Mr. Reuter ever discussed with him "accepting a lump sum square foot amount of 88,800," he testified that they had, but that he did not authorize using 88,800 square feet. On cross-examination, Mr. Agostini admitted that he gave Mr. Reuter authority to sign the subcontract "[w]ith Michael Bahry, with all the markups."

**4**

**The Testimony of Michael Bahry**

The next witness to testify was Michael Bahry, who testified that he had been employed at Bacon for a total of seventeen years. He stated that he was the vice president of operations for most of that time and that part of his role in that position was to serve as head of purchasing. He further stated that, in 2007, he was involved in the dormitory construction project at RIC. Mr. Bahry testified that he received the final bid from NESC and used it to draft the subcontract that was faxed to NESC on April 16, 2007, which NESC signed and returned with markups on April 18, 2007.

Mr. Bahry then testified that, after receiving the signed, marked-up subcontract from NESC, Mr. Reuter "mentioned possibly converting the contract to a fixed sum because NESC had appealed to him to do so." He testified that he told Mr. Reuter that he did not want to do that "[b]ecause the estimate that came back from NESC's estimator was lower than the lower number in the contract, which was odd." Mr. Bahry also testified that he told Mr. Reuter that he had concerns about committing to a number higher than the estimate because "it could possibly at the end even be lower than that number * * *."

It was further Mr. Bahry's testimony that, on April 18, 2007, after receiving the returned contract from NESC which still included a range for square footage, he expected that the "[square footage] would be quantified at the end of the job by the exact amount of product that was put down." He also testified that he had a discussion with Mr. Reuter in which he "strongly suggested that's how we do it because [he] thought that was the most just way to determine what the contract should be." Mr. Bahry testified that he had a similar conversation with "someone from NESC but [he did not] recall who that was," after the parties received the estimate generated by Civil

Takeoffs, during which conversation "[they] both kind of laughed about it a little bit, because you wouldn't expect their number to come back lower than the range that was in the contract." He further stated that he suggested to this individual that the parties do a field measurement at the end of the job and that the individual thought that this suggestion was fair; but he added that the contract was never modified to that effect.

Mr. Bahry testified that the agreement which he marked up and Bacon faxed to NESC on May 3, 2007 was the "last written expression of the parties * * *." On cross-examination, Mr. Bahry testified that Mr. Reuter had authority to sign the contract "[a]fter he had approval from someone in the office," but he stated that he could not recall having approved of Mr. Reuter's signing the just-referenced contract.

**5**

**The Testimony of David DeQuattro**

The next witness on behalf of Bacon was David DeQuattro, who testified that he was the managing principal of Robinson Green Beretta. Mr. DeQuattro testified that he was involved with the RIC dormitory project in 2007. He stated that his duties included overseeing all of the drawings and specifications. Mr. DeQuattro further testified that the floor plans identified what types of flooring and finishes were to be installed in each room. He also testified that a dispute arose regarding the areas where the Maxxon products (both Dura-Cap and WearTop) were actually installed. Mr. DeQuattro further testified that he "assigned Mr. Beretta the responsibility to go out and verify condition as-built versus what's on the plans as far as size and materials."

**6**

**The Testimony of Richard Beretta**

Lastly, Richard Beretta testified on behalf of Bacon. He provided that he was a self-employed general contractor who was asked by Mr. DeQuattro to "measure[] as an as-built" the dormitory at RIC. Specifically, he testified that he was hired in June of 2017 to measure the square footage of the interior spaces of the building and to conduct a field survey of the Maxxon flooring system. Mr. Beretta testified that, after conducting the survey, he created a narrative report for Robinson Green Beretta reflecting the results. On cross-examination, Mr. Beretta testified that his report indicated that 89,250 square feet of Dura-Cap were installed and that 74,691 square feet of WearTop were installed.

**C**

**The Verdict and Bacon's Motion for a New Trial**

On November 2, 2017, after both parties had rested, the trial justice instructed the jury on a variety of topics, including the apparent authority of an agent, the required elements of a contract, breach of contract, damages, and unjust enrichment. Neither party objected to these instructions. On the same date, the jury returned its verdict. In response to the first interrogatory ("Did the parties agree to the square footage of the flooring installation?"), the jury answered, "Yes." In response to the second and third interrogatories ("What is the square footage that was agreed upon with respect to Duracap?" and "What is the square footage that was agreed upon with respect to Weartop?"), the jury answered "88,800" as to both. The jury awarded NESC $125,733.67 in damages.

On November 14, 2017, Bacon filed a "Motion for New Trial Pursuant to Rule 59, or in the Alternative, Remittitur," asserting that the verdict "failed to respond truly to the merits of the

case or to administer substantial justice between the parties, and is against the fair preponderance of the evidence." On December 18, 2017, after reviewing the written submissions of the parties and conducting a hearing, the trial justice rendered a bench decision denying Bacon's motion for a new trial and its alternative request for a remittitur. An order entered to that effect on January 3, 2018, and Bacon appealed. NESC cross-appealed from the denial of its motion to amend and its motion to reconsider its motion to amend.[7]

## II

## Standard of Review

We have consistently indicated that we afford a trial justice's ruling on a motion for a new trial great deference. *Branson v. Louttit*, 213 A.3d 417, 427 (R.I. 2019). "In considering a motion for a new trial, the trial justice sits as a super juror and is required to make an independent appraisal of the evidence in light of his or her charge to the jury." *Letizio v. Ritacco*, 204 A.3d 597, 602 (R.I. 2019). When conducting this independent appraisal, the trial justice must "consider[] all the material evidence in the case, pass on the weight of the evidence and the credibility of the

---

[7] On February 27, 2017, an order entered severing NESC's claim of insurer bad faith from the remaining claims.

NESC filed two notices of appeal concerning the denial of its motion to amend. The first was filed on November 22, 2017, after the verdict was rendered but while Bacon's motion for a new trial was still pending before the Superior Court; and, therefore, that appeal was prematurely filed. However, on February 7, 2018, NESC filed a second notice of appeal, cross-appealing from Bacon's appeal from the denial of its motion for a new trial. Thus, any defect in NESC's first appeal was rectified by the filing of the second appeal.

We also note that, following an order from this Court remanding the case to Superior Court for entry of final judgment pursuant to Rule 54(b) of the Superior Court Rules of Civil Procedure, NESC filed a motion for separate and final judgment as to all claims between NESC and Bacon. An order entered on February 11, 2019 granting NESC's motion, and separate and final judgment pursuant to Rule 54(b) entered on March 18, 2019. At oral argument, the parties represented that NESC's insurer bad faith claim is still pending before the Superior Court. Although both appeals were filed prior to the entry of separate and final judgment, we consider both appeals as timely because "this Court has stated that it will treat a premature appeal as if it had been timely filed." *Chapdelaine v. State*, 32 A.3d 937, 941 n.1 (R.I. 2011) (internal quotation marks omitted).

witnesses, and decide whether the jury verdict responds to the evidence presented and does justice between the parties." *Rose v. Cariello*, 85 A.3d 618, 622 (R.I. 2014). "If, after conducting this analysis, the trial justice concludes that the evidence is evenly balanced or that reasonable minds could differ on the verdict, she or he should not disturb the jury's decision." *Letizio*, 204 A.3d at 602 (quoting *Kemp v. PJC of Rhode Island, Inc.*, 184 A.3d 712, 719 (R.I. 2018)).

When reviewing a trial justice's decision to either grant or deny a motion for a new trial, this Court "will not disturb such a ruling * * * unless he or she overlooked or misconceived material evidence or was otherwise clearly wrong in performing his or her function." *Branson*, 213 A.3d at 427 (quoting *Bajakian v. Erinakes*, 880 A.2d 843, 852 (R.I. 2005)).

"Although the fixing of damages is normally a function of the jury, it may be rejected by a trial justice on a motion for a new trial." *Reccko v. Criss Cadillac Company, Inc.*, 610 A.2d 542, 545-46 (R.I. 1992). Alternatively, the trial justice may order a remittitur "if [he or she] concludes, after passing upon the evidence, that the plaintiff is not entitled to such an award or that the award is unreasonable in light of the evidence presented at trial." *Bonn v. Pepin*, 11 A.3d 76, 78 (R.I. 2011) (quoting *Reccko*, 610 A.2d at 546). The trial justice is permitted to "order a remittitur of the award if it shocks the conscience or it 'clearly appears to be excessive, or to represent the passion and prejudice of the jury rather than their unbiased judgment.'" *Hough v. McKiernan*, 101 A.3d 853, 856 (R.I. 2014) (quoting *Reccko*, 610 A.2d at 546).

We also "afford great deference to the trial justice's ruling on a motion to amend." *Harodite Industries, Inc. v. Warren Electric Corporation*, 24 A.3d 514, 529 (R.I. 2011) (internal quotation marks omitted). Such deference follows from the well-established principle that "the decision to grant or to deny a motion to amend a complaint is confided to the sound discretion of the [trial] justice." *Id.*

# III

## Analysis

### A

### Bacon's Motion for a New Trial

On appeal, Bacon contends that the trial justice's decision denying its motion for a new trial should be vacated because the trial justice "overlooked or misconceived the evidence, or was clearing wrong in finding:" (1) that "the parties had a meeting of the minds on using 88,800 square feet as a firm lump sum number;" (2) that "there was mutual assent on material terms between the parties to convert the written unit-price subcontract * * * into a verbal lump-sum subcontract agreement for the payment of both components;" and (3) that "[Mr.] Reuter had the authority to bind [Bacon] to an agreement regarding Final Quantities and Final Pricing based on Square Footage Estimates." Alternatively, Bacon argues that the trial justice erred in denying its request for a remittitur because the undisputed evidence at trial showed that NESC installed only 74,691 square feet of WearTop, and, thus, NESC breached the subcontract by billing Bacon for WearTop that it had not installed.

It is clear to us that Bacon's contentions on appeal center on questions of credibility, a matter concerning which we accord the trial justice great deference when deciding on a motion for a new trial. *See Bajakian*, 880 A.2d at 852. After reviewing the record, we conclude that the trial justice properly performed her role as a "super juror" by evaluating the evidence, assessing the credibility of witnesses, and, accordingly, using those findings as a basis for concluding that reasonable minds could differ as to whether the parties agreed to use 88,800 square feet as a final quantity for the contract.

The trial justice focused her review primarily on the testimony of Mr. Petronio and Mr. Reuter. She found that both witnesses offered "self-serving testimony that contradicted earlier positions taken by each of them." As to Mr. Petronio, the trial justice noted that his testimony was inconsistent with NESC's sworn answers to interrogatories which provided that it was Mr. Petronio who first suggested using an as-built measurement during the phone conversation with Mr. Reuter, and that there was "no meeting of the minds on square footage." As to Mr. Reuter, the trial justice found that in Mr. Reuter's deposition, unlike what he stated in his in-court testimony, he made no mention of his agreement to use the 88,800 square feet figure as being contingent upon approval from Mr. Agostini. The trial justice also noted that Mr. Reuter stated in his deposition that the measurement "ended up being 88,800 square feet," which testimony was inconsistent with Bacon's position at trial. Further, the trial justice found that both Mr. Petronio and Mr. Reuter "downplay[ed] the grant of authority from the principals of their respective companies."

Despite finding neither witness fully credible, the trial justice stated that "what was unquestionable were two events which * * * tended to corroborate that there had been an agreement to use the 88,800 square foot figure as plaintiffs contend." The first event noted by the trial justice was "Bacon's request for a credit based on the 88,000 square feet of flooring * * * as set forth in a change order dated December 21, 2007 * * *." The second event was the fact that "Bacon finally got an as-built survey completed ten years after the flooring was installed."

In her decision, the trial justice found that "the meeting of the minds and the use of the 88,800 square foot figure was reached orally, in a phone call after Petronio rejected the use of Civil Takeoffs'[s] lower figure of 83,318." The trial justice then found that "reasonable minds could differ in determining if it was more likely than not that there was an agreement to use 88,800

- 16 -

square feet as the actual number for calculating the contract price," and she denied Bacon's motion for a new trial on NESC's breach of contract claim on that basis. Based on the same reasoning, the trial justice denied Bacon's motion for a new trial on its own counterclaim for breach of contract.

We fail to perceive any basis for concluding that the trial justice overlooked or misconceived material evidence. The trial justice acknowledged inconsistencies within the testimonies of Mr. Petronio and Mr. Reuter, but ultimately concluded that the evidence supported the jury's finding in favor of NESC. As we have previously recognized, inconsistencies within the testimony of a witness "do[] not *ipso facto* render the testimony unworthy of belief." *State v. Jensen*, 40 A.3d 771, 781 (R.I. 2012). It is the duty of the fact-finder to take such inconsistencies into account without necessarily giving them dispositive weight. Moreover, the court is free to accept some but not all portions of a witness's testimony. *See King v. Huntress*, 94 A.3d 467, 495 (R.I. 2014) (recognizing that a fact-finder has the right "to pick and choose from [a witness's] testimony what portions he [or she] deems worthy of belief") (internal quotation marks omitted); *Rhode Island Consumers' Council v. Smith*, 111 R.I. 271, 295-96, 302 A.2d 757, 772 (1973).

Additionally, since it is our view that the trial justice did not err in finding that reasonable minds could differ as to whether the parties agreed to use 88,800 square feet as a firm quantity, it was appropriate for her to reject Bacon's argument that the jury improperly converted a unit-price contract into a lump-sum contract. Similarly, we see no error in the trial justice's finding that reasonable minds could differ as to whether Mr. Reuter had apparent authority to bind Bacon to the agreement to use the 88,800 square feet figure. Notably, Mr. Reuter, as executive manager for Bacon, signed the agreement faxed to Mr. Petronio on May 3, 2007, which replaced the 88,800 square footage figure with 83,318, and included a note on the fax cover sheet telling Mr. Petronio

to call him if he had any questions. Moreover, the trial justice found that Mr. Reuter's testimony regarding his lack of authority to agree to use the 88,800 square feet figure was lacking in credibility. We are satisfied that the trial justice did not clearly err, nor did she overlook or misconceive material evidence in denying Bacon's motion for a new trial.

With regard to Bacon's request for a remittitur, the trial justice found that the damages award comported with the evidence presented at trial. Because the jury's award was simply based on a calculation of the agreed-to price per square foot of $10.69 multiplied by the quantity that the jury found the parties had agreed upon (88,800 square feet), we agree with the trial justice's conclusion that "[t]he award in no way shocks the conscience nor does it clearly appear to be excessive or represent the passion and prejudice of the jury." Thus, the trial justice appropriately denied Bacon's request for a remittitur.

**B**

**NESC's Motion to Amend and Motion to Reconsider**

We begin by noting that NESC has not provided us with transcripts of hearings regarding its August 4, 2014 motion to amend or its September 9, 2016 motion to reconsider the denial of its motion to amend. In such a situation, the following often stated principle controls the result:

> "The deliberate decision to prosecute an appeal without providing the Court with a transcript of the proceedings in the trial court is risky business. Unless the appeal is limited to a challenge to rulings of law that appear sufficiently on the record and the party accepts the findings of the trial justice as correct, the appeal must fail." *Adams v. Christie's, Inc.*, 880 A.2d 774, 778 (R.I. 2005) (quoting *731 Airport Associates, LP v. H & M Realty Associates, LLC*, 799 A.2d 279, 282 (R.I. 2002)).

As previously indicated, "the decision to grant or to deny a motion to amend a complaint is confided to the sound discretion of the [trial] justice." *Harodite Industries, Inc.*, 24 A.3d at 529. In this case, the motion to amend and the motion to reconsider were heard before two different

justices of the Superior Court. Both hearing justices conducted hearings prior to entering orders denying the respective motions. Without the benefit of a transcript setting forth the hearing justices' reasoning, and in light of the great deference that we accord to a hearing justice when reviewing a decision to grant or deny a motion to amend, we see no basis to vacate the hearing justices' orders. Therefore, NESC's cross-appeal is denied.

**IV**

**Conclusion**

For the reasons set forth in this opinion, we affirm the judgment and orders of the Superior Court. The record may be returned to that tribunal.

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

**SUPREME COURT – CLERK'S OFFICE**

**OPINION COVER SHEET**

| | |
|---|---|
| **Title of Case** | NESC, Inc. d/b/a New England Specialty Concrete v. Bacon Construction Co., Inc., et al. |
| **Case Number** | No. 2017-423-Appeal. No. 2018-107-Appeal. No. 2018-111-Appeal. (PC 08-4992) |
| **Date Opinion Filed** | February 17, 2020 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Patricia A. Hurst Associate Justice Kristin E. Rodgers |
| **Attorney(s) on Appeal** | For Plaintiff: Frederic A. Marzilli, Esq. Robert J. Roughsedge, Esq. J. Mark Dickison, *Pro Hac Vice* Michael Williams, *Pro Hac Vice* |
| | For Defendant: David M. Campbell, Esq. Christopher J. Fragomeni, Esq. Girard R. Visconti, Esq. |